FILED

Jeanne A. Naughton, CLERK

**January 31, 2018**

United States Bankruptcy Court
Newark, NJ

By:  /s/ Margaret Cohen, Judicial Assistant

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>CHRISTIAN CHUNG-HWAN KIM,<br><br>                Debtor. | Case No.:      12-30363 VFP<br><br><br>Chapter  7 |
| ROBIN DUNLOP and LAURA DUNLOP,<br>                Plaintiffs,<br>v.<br>CHRISTIAN CHUNG-HWAN KIM,<br>                Defendant. | Adv. Pro. No.: 12-2140 VFP |

## **TRIAL OPINION**

### **APPEARANCES**

GIORDANO, HALLERAN & CIESLA
Donald F. Campbell, Jr., Esq.
Geoffrey E. Lynott, Esq.
125 Half Mile Road, Ste. 300
Red Bank, NJ  07701-6777
Attorneys for Plaintiffs, Robin Dunlop and Laura Dunlop

RABINOWITZ, LUBETKIN & TULLY, LLC
Jay L. Lubetkin, Esq.
Larry K. Lesnik, Esq.
293 Eisenhower Parkway, Ste. 100
Livingston, NJ  07039
Attorneys for Debtor/Defendant

**VINCENT F. PAPALIA, Bankruptcy Judge**

## I.    INTRODUCTION

This matter is before the Court following the trial on the Amended Complaint of Plaintiffs Robin Dunlop and Laura Dunlop ("Robin" and "Laura" and collectively, the "Dunlops") to except from discharge under 11 U.S.C. § 523(a)(2)(A) or (a)(6) the Debtor's obligations under a Default Judgment (the "Judgment") entered in Superior Court of New Jersey, Law Division, Bergen County, Dkt. No. BER-L-2826-10, in the amount of $4,135,330.05 on August 1, 2011 against Debtor Christian Chung-Hwan Kim (the "Debtor"). The Judgment and damages arose from a home renovation contract between the Plaintiffs and Debtor. This Court conducted a twelve-day trial on the matter,[1] and each party submitted a Post-trial Brief and Reply Brief. The Court has considered all submissions, trial testimony and exhibits, and issues the following decision.

## II.    JURISDICTIONAL STATEMENT

The Court has jurisdiction over this matter under 28 U.S.C. § 1334(b) and the Standing Orders of Reference entered by the United States District Court on July 10, 1984 and amended on September 18, 2012. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (I) and (O). Venue is proper in this Court under 28 U.S.C. § 1408. The Court issues the following findings of fact and conclusions of law pursuant to FED. R. BANKR. P. 7052. To the extent that any of the findings

---

[1] The Transcripts referenced throughout this Opinion are defined in the following manner:
Trial Tr. vol. 1, Sept. 21, 2016 (Dkt. No. 105).
Trial Tr. vol. 2, Sept. 23, 2016 (Dkt. No. 108).
Trial Tr. vol. 3, Sept. 28, 2016 (Dkt. No. 145).
Trial Tr. vol. 4, Sept. 29, 2016 (Dkt. No. 119).
Trial Tr. vol. 5, Oct. 19, 2016 (Dkt. No. 125).
Trial Tr. vol. 6, Oct. 21, 2016 (Dkt. No. 126).
Trial Tr. vol. 7, Nov. 16, 2016 (Dkt. No. 129).
Trial Tr. vol. 8, Nov. 18, 2016 (Dkt. No. 131).
Trial Tr. vol. 9, Dec. 2, 2016 (Dkt. No. 139).
Trial Tr. vol. 10, Dec. 7, 2016 (Dkt. No. 133).
Trial Tr. vol. 11, Dec. 9, 2016 (Dkt. No. 134).
Trial Tr. vol. 12, Dec. 21, 2016 (Dkt. No. 137).
Pretrial Hr'g Tr., Sept. 20, 2016 (Dkt. No. 141).

of fact might constitute conclusions of law, they are adopted as such. Conversely, to the extent that any conclusions of law constitute findings of fact, they are adopted as such.

### III.    STATEMENT OF FACTS AND PROCEDURAL HISTORY

#### A.    Plaintiffs' Purchase of the Property and Retention of Barbara Hess

In September 2007, the Plaintiffs, Robin and Laura Dunlop, who are daughter and mother, respectively, purchased a residence at 25 Christopher Place, Saddle River, New Jersey, a one-story ranch house (the "Property").[2]    The Dunlops were introduced to the Property by Barbara Hess ("Hess"), an architect whom they met in 2005 at a home-improvement show.[3]    The Dunlops intended to "gut" the house, adding a second story and a third bay in the garage, and making it wheelchair accessible for Robin's father, Laura's spouse (the "Project").[4]    The Plaintiffs engaged Hess in December 2007 to draw up the architectural plans for the Project to be submitted to the Borough of Saddle River (the "Borough").[5]    The Plaintiffs' relationship with Hess deteriorated over Hess's billing practices, which Robin asserted were casual, unprofessional and inaccurate, and over Hess's insistence on including in the architectural drawings details that were not required to obtain the building permit from the Borough.[6]    Those matters resulted in substantial delays in moving the Project forward and ultimately caused the Plaintiffs to end their relationship with Hess in about June 2008.[7]

---

[2] Trial Tr. vol. 1, 34:3-9; 34:14-15.
[3] Trial Tr. vol. 1, 32:7-10; 34:19-21.
[4] Trial Tr. vol. 1, 31:7-11; 37:19-38:4.
[5] Trial Tr. vol. 1, 39:23-25; 40:4-12.
[6] Trial Tr. vol. 1, 40:17-20; 41:1-42:7; 42:20-43:8.
[7] Trial Tr. vol. 1, 42:18-21.

### B. <u>Plaintiffs' Pre-Contract Dealings with the Debtor</u>

Hess introduced the Debtor to the Dunlops as a contractor in January or February 2008.[8]

The Plaintiffs talked with other builders and met with Debtor at least several times before they

hired him in June 2008.[9]   The Debtor represented to the Plaintiffs that he had the capability to

design, build and landscape.[10]   After sharing their ideas with the other contractors, the Plaintiffs

determined that Debtor "was, honestly he was the best" contractor for the Project.[11]   The Dunlops

were particularly impressed by Debtor's overall presentation:

> ROBIN:    He went above and beyond as far as doing the presentation.  He
> showed us pictures on his computer.  He gave us very detailed
> what he called the statement of work, and list of materials
> separate and apart from the other contractors where they gave
> sort of like a one price for everything, you know, with them
> having the final say as to what went into the house.[12]

As to the portion of Debtor's presentation relating to certain photographs, Robin explained:

> ROBIN:    So with the photos Christian showed us photos on his computer
> as well as he directed me to his website CHDB.net.  And in both
> places he had photos that were illustrative of his work.  He did
> not make a distinction as to whether or not it was work that he
> could do versus work that he had done, but he presented
> everything as being his work.[13]

Robin thought that "the purpose of the photos was to show us what [Debtor] had done in

the past.  What it was that he could do for our house."[14]   Robin was also persuaded by the list of

references that the Debtor gave her, including those that indicated he had performed new

construction, because of the extensive renovation the Plaintiffs were undertaking.[15]   As part of

---

[8] Trial Tr. vol. 1, 44:10-14.
[9] Trial Tr. vol. 1, 45:10-16.
[10] Trial Tr. vol. 1, 44:18-45:9.
[11] Trial Tr. vol. 1, 47:6-9.
[12] Trial Tr. vol. 1, 47:9-15.
[13] Trial Tr. vol. 1, 47:24-48:4.
[14] Trial Tr. vol. 1, 49:11-13.  (On cross-examination, Robin testified that Debtor showed her these pictures both before and after the Plaintiffs entered into the Contract with him.  Trial Tr. vol. 4, 41:11-42:11).
[15] Trial Tr. vol. 1, 54:8-55:8; Ex. P-2, "Current 2007 Projects-CHDB Inc./Grounds."

those initial discussions, the Debtor also took the Dunlops to certain projects that he had worked on.[16]

### 1. The Photographs

As noted, one of the principal methods by which Debtor marketed his capabilities was through the use of photographs on his subsequently destroyed laptop and website that showed work he "had done or could do."  He also described the work that he performed on several properties as "new construction" that included "the entire building and landscaping from bottom up."[17]  Because the Dunlops' Project was essentially a reconstruction of their entire home, these representations led them to believe he was capable of doing the same type and scope of work for them.[18]

As to the photographs, an extensive amount of the pretrial proceedings and testimony at trial were devoted to the parties' dispute as to whether the photographs that the Debtor admittedly destroyed represented work that the Debtor had done himself or were more broadly represented to be "work he had done" or "work he could do, and work he thought we [the Dunlops] wanted."[19]  The Debtor insisted that it was the latter, while Robin testified at trial that the Debtor represented that the photographs exclusively depicted work that the Debtor had done.  However, as is pointed out by the Debtor, the deposition and other sworn testimony of Laura, Walter Booker and even Robin herself supports the Debtor's view in this instance; i.e., the photographs showed work that the Debtor had done, could do and that he thought the Dunlops wanted.  Despite the Court's significant reservations about the Debtor's overall credibility, the Court finds that the weight of the testimony supports the Debtor's view on this issue.  The Court also finds, however, that its

---

[16] Trial Tr. vol. 1, 68:3-69:7, 69:17-25.

[17] Trial Tr. vol. 1, 54:23-55:1.

[18] Trial Tr. vol. 1, 55:13-19.

[19] Trial Tr. vol. 4, 64:9-10 (quoted statement contained in Robin's Certification dated May 21, 2015 and submitted on May 22, 2015 in opposition to Debtor's Motion for Summary Judgment, Dkt. No. 64-4, ¶ 308, Debtor's Post-trial Br. at 5, Dkt. No. 144).

resolution of this factual dispute is not dispositive of the issue as to whether the photographs misrepresented the Debtor's capabilities, past performance and experience as to work he "had done" or "could do."  Debtor himself acknowledged that he showed Plaintiffs the photographs as "examples of my experience or my abilities in the construction industry."[20]

The Court finds that the photographs would have been relevant evidence of the work the Debtor "had done" or "could do."  They were not available because they were admittedly destroyed by the Debtor.  This Court finds that the photographs would have provided further evidence of the Debtor's representations of the work he had done and could do and that the Plaintiffs are entitled to an adverse inference that at least certain of the photographs represented: (i) work the Debtor said he had done, but did not; and (ii) work the Debtor said he had the capability and experience to do, but did not.

### 2.  The Proposal and Statement of Work

In early June 2008, the Debtor prepared and sent to the Plaintiffs a Proposal (the "Proposal") which consisted of: (i) a Statement of Work ("SOW") dated June 4, 2008; (ii) a list of Client Material Costs dated June 4, 2008; and (iii) a one-page cover sheet titled "Proposal" dated June 18, 2008.[21]  Robin testified that she received all three elements of this document on June 4, 2008, even though the first date on the Proposal page is "June 18, 2008," and the text of the Proposal page indicates agreement reached on June 14, 2008.[22]  Robin did not deem these documents to constitute a contract, but rather a proposal, and negotiations ensued.[23]

The Debtor initially argued that all the changes made to the initial Proposal were made by Robin and accepted on a blanket basis by Debtor.  However, Debtor ultimately acknowledged that

---

[20] Kim Certif., at ¶ 4, Sept. 7, 2016 (Dkt. No. 92).
[21] Trial Tr. vol. 1, 73:13-21; Ex. P-5 at 1, "CHDB, Inc. – Proposal."
[22] Trial Tr. vol. 1, 73:13-21; Ex. P-5 at 1.
[23] Trial Tr. vol. 1, 72:25-73:2; 73:13-21.

while Robin was the scrivener with respect to the changes, the changes were made with the input of both parties.[24]

The total cost reflected on the last page of the Proposal was $699,312, which the Debtor agreed to reduce by $149,312 to $550,000 (reducing by fifty percent any payments made in cash).[25] The $550,000 price was still $50,000 over the Plaintiffs' budget, but was nonetheless accepted by the Dunlops.[26]  The SOW separately charged the Plaintiffs for the costs of materials estimated to be in the range of $215,000 to $309,000.[27]  The SOW included a schedule of incremental payments from the Plaintiffs to the Debtor upon the completion of specific elements of the demolition and renovation.[28]

Robin was still uneasy about the Proposal ("I wasn't a hundred percent comfortable—this, to me, is not a contract") and "felt like we needed something more."[29]  Hess (who was still involved at the time) recommended using the American Institute of Architects ("AIA") *Standard Form of Agreement Between Owner and Contractor* Document A101-2007, which consisted of a seven-page form to fill in and modify to the contracting parties' specifications and an additional thirty-eight pages of *General Conditions* Document A201-2007, on which no modifications were made.[30]  The *Standard Form of Agreement* references the Proposal/SOW in six different locations. Each reference to the Proposal/SOW and every handwritten alteration to the AIA *Standard Form of Agreement* was initialed by the Debtor and by Laura.[31]  The AIA *Standard Form of Agreement* is signed by Laura and by the Debtor and dated June 18, 2008.[32]  The AIA *Standard Form of*

---

[24] Trial Tr. vol. 11, 62:3-18; 63:23-24; 64:19-24.
[25] Trial Tr. vol. 1, 94:1-16.
[26] Trial Tr. vol. 1, 94:16-95:2.
[27] Trial Tr. vol. 1, 90:22-91:7; Ex. P-5, Proposal/SOW, Client Material Costs.
[28] Ex. P-5, Proposal/SOW at 7, Sec. K, Payment Schedule.
[29] Trial Tr. vol. 1, 95:11-13.
[30] Trial Tr. vol. 1, 95:13-20 (as to Hess's recommendation); Ex. P-6, American Institute of Architects ("AIA") *Standard Form of Agreement Between Owner and Contractor* Document A101-2007 and *General Conditions* Document A201-2007.
[31] Ex. P-6, The AIA *Standard Form of Agreement* and *General Conditions*.
[32] Ex. P-6, The AIA *Standard Form of Agreement* and *General Conditions*.

*Agreement* and *General Conditions* are referred to as the "AIA Documents." The AIA Documents and the Proposal/SOW are collectively referred to as the "Contract."[33] The SOW indicated that construction would start on August 1, 2008, and initially estimated that it would be completed by May 2009.[34]

As to the standards regarding the work to be performed by the Debtor and his company, the Contract and specifically the SOW provided (among other things) that:

(i)     All work to be done to state and local codes and approved by owner (SOW, Section L, ¶ 8).

(ii)    Contractor agrees to undertake all work diligently in a good workmanlike manner, in accordance with good quality residential standards and practices in the State of New Jersey, and in compliance with any applicable state and local building codes (SOW, Section L, ¶ 10).

(iii)   Contractor agrees to keep the site orderly and reasonably free of debris (SOW, Section L, ¶ 11).

(iv)    Contractor shall be responsible for the safekeeping of all general finish materials until they are installed in the home (SOW, Section C, final bullet point, last sentence).

### 3.  Plaintiffs Fire Hess and Retain a New Architect

By June 2008, Hess still had not finished the architectural plans (a prerequisite to obtaining a building permit from the Borough despite repeated inquiries from the Debtor).[35] Debtor reminded the Plaintiffs that he had design capability.[36] Debtor also represented to the Dunlops that he had an architect on staff.[37] That statement was a misrepresentation, as the licensed architect to whom the Debtor referred, Jason Nicholas ("Nicholas"), had been self-employed since 2003 (except for a short time from 2012 through 2014, a period not germane to this case, when he was

---

[33] Pl. Post-trial Br. at 10 (Dkt. No. 144).
[34] Ex. P-5, SOW at 6.
[35] Trial Tr. vol. 1, 103:22-104:6; 109:14-110:24.
[36] Trial Tr. vol. 1, 104:6-25; 109:20-110:3.
[37] Trial Tr. vol. 1, 110:1-5, 115:10-24.

employed by a different firm).[38]  The facts developed at trial demonstrated that Nicholas was never employed by Debtor and that Nicholas never authorized Debtor to represent that Nicholas was his employee.[39]

Debtor initially denied that he ever said or indicated that Nicholas was his employee. However, at trial, after being confronted with a website used by the Debtor and recovered by the Dunlops that indicated that Nicholas was a CHDB employee, the Debtor was forced to acknowledge his misrepresentation as to Nicholas's status as an employee.[40]  While the Court previously determined that this misrepresentation could not form the basis of a fraud claim because (among other things) the Dunlops: (i) acknowledged that they had no issues with the work performed by Nicholas; and (ii) rehired Nicholas after they fired the Debtor, the Court left open the possibility that this area of inquiry could be used to determine the Debtor's credibility.  Here, the Court finds that Debtor made a misrepresentation to the Dunlops as to Nicholas's status as an employee, both during the Project and again at trial.

Debtor ultimately recommended that the Plaintiffs fire Barbara Hess.[41]  On or about June 27 or 28, 2008, the Plaintiffs fired Barbara Hess as their architect.[42]  Robin testified that the Plaintiffs hired the Debtor, using Nicholas as their architect, on July 2 or 3, 2008.[43]  On July 3, 2008, Laura signed a letter agreement dated July 1, 2008 (the "Architectural Agreement") for the Debtor to complete the architectural drawings at an additional cost of $5,000.[44]  The Architectural Agreement, which the Debtor countersigned, includes the statement:  "I represent and warrant that CHDB, Inc. employees are licensed architects in the State of New Jersey."[45]  Debtor opined at trial

---

[38] Trial Tr. vol. 8, 5:2-20 (testimony of Nicholas).
[39] Trial Tr. vol. 8, 6:6-10; 6:24-7:4; 8:7-19.
[40] Trial Tr. vol. 11, 94:15-18; 96:8-25.
[41] Trial Tr. vol. 1, 110:21-111:1; 111:22-23.
[42] Trial Tr. vol. 1, 111:22-23.
[43] Trial Tr. vol. 1, 111:23-24.
[44] Trial Tr. vol. 1, 112:2-113:4; Ex. P-8, Architectural Agreement.
[45] Trial Tr. vol. 1, 115:12-14; Ex. P-8, Architectural Agreement.

that he is not responsible for this misstatement (even though he signed it) because Robin, not he, wrote the Architectural Agreement.[46]  However, as previously noted, Debtor was forced to admit at trial that he made this same misrepresentation on his website.

In late June or early July 2008, after the Contract was entered into, Plaintiffs hired Walter Booker ("Booker"), a family friend, known particularly to Laura, and a building inspector in Spring Valley, New York, to help the Plaintiffs "manage our responsibilities under the proposal."[47] The Plaintiffs paid him "[a] couple of thousand dollars," and he assisted them in selecting materials and generally overseeing the Project and its progress.[48]  Booker did not begin work for the Dunlops until after they had hired the Debtor and entered into the Contract with him.[49]  After being retained, Booker soon expressed serious reservations to the Dunlops about the Debtor's capabilities and workmanship.[50]  Booker stopped working for the Plaintiffs about the same time they fired the Debtor.[51]

### C.  The Construction Project and Progress Payments

As noted above, the Proposal/SOW provided that construction on the Project was to begin on August 1, 2008.[52]  New Jersey Construction Law requires incremental inspection of each phase of a permitted construction or renovation project to insure the safety of the work before the construction proceeds to the next phase, e.g., from foundation to framing to insulation to electrical to finishes.[53]  Until the appropriate office inspects and passes one element of construction, the

---

[46] Trial Tr. vol. 11, 92:17-19.
[47] Trial Tr. vol. 2, 11:22-12:12:10.  (On cross-examination, Robin testified that she did not think that Booker was as necessary as Laura did.  Trial Tr. vol. 4, 44:12-46:9); ("I didn't know why we needed him."  Trial Tr. vol. 4, 45:16). (On cross-examination, Robin also testified that Booker indicated to both Plaintiffs that Debtor was not the right person for the job.  Trial Tr. vol. 4, 51:10-25).
[48] Trial Tr. vol. 2, 12:11-17; 13:8-20.
[49] Trial Tr. vol. 4, 41:20-22.
[50] Trial Tr. vol. 4, 51:10-12.
[51] Trial Tr. vol. 2, 12:18-24.
[52] Ex. P-5, Proposal/SOW at 6.
[53] Trial Tr. vol. 9, 4:11-5:12; 7:3-10:15 (testimony of Michelle Wood, Building Inspector for the Borough during the relevant period) (neither party has cited the applicable statute or regulation).

contractor cannot proceed to the next element.[54]  Concomitantly, the Proposal/SOW required the

Plaintiffs to make incremental payments to the Debtor only as each element of construction was

completed and required approvals were obtained.[55]  Relatedly, the Contract provided (among other

things) that "[a]ll work to be done to state and local codes and approved by owners."[56]

The payment schedule set forth in the Proposal/SOW was:[57]

| No. | Method (Date)[58] | Benchmark | Amount |
|---|---|---|---|
| 1. | Check for Cash (June 27, 2008) | Upon signing contract, before submittal for permit - signed June 18, 2008 | $ 20,000.00 |
| 2. | Check for Cash (July 22, 2008) | Upon submittal for permit - submitted July 22, 2008 | $ 20,000.00 |
| 3. | Check (Aug. 1, 2008) | Upon start of demolition | $ 50,000.00 |
| 4. | Check (Nov. 10, 2008) | Upon approval of footing inspection | $ 70,000.00 |
| 5. | Cash (Dec. 17, 2008) | Upon approval of slab inspection | $ 70,000.00 |
| 6. | Check (Oct. 28, 2008) | Upon start of framing (electrical/plumbing will start) | $ 65,000.00 |
| 7. | Check (Jan. 21, 2009) | Upon completion of framing and roofing (rough electric/plumbing) and written approval by Barbara Hess Architect and/or Owner | $ 65,000.00 |
| 8. | Cash (July 11, 2009) | Upon start of sheetrock and siding and approval by Owner | $ 45,000.00 |
| 9. | Check (Revised by Amendment) | Upon completion of sheetrock and siding and written approval by Barbara Hess Architect and/or Owner | $ 45,000.00 |
| 10. | Check (Revised by Amendment) | Upon completion of tiling and written approval by Owner | $ 20,000.00 |
| 11. | Check (Revised by Amendment) | Upon completion of flooring and written approval by Owner | $ 20,000.00 |
| 12. | Check (Revised by Amendment) | Upon completion of trim/painting and start of Landscape and written approval by Owner | $ 20,000.00 |
| 13. | Check (Revised by Amendment) | Upon Owner's receipt of a Certificate of Occupancy and completion of Landscaping and written approval by Owner. | $ 40,000.00 |
| | | **Total:** | **$550,000.00** |

In this case, the Debtor repeatedly misrepresented to the Plaintiffs that the Borough had

approved an element of construction and obtained payments from the Plaintiffs on that basis, even

---

[54] Trial Tr. vol. 9, 9:14-10:15 (testimony of Michelle Wood).
[55] Ex. P-5, Proposal/SOW at 7, Sec. K, Payment Schedule.
[56] Ex. P-5, Proposal/SOW, Sec. L, ¶ 8.
[57] Adapted from Ex. P-5, Proposal/SOW, Sec. K at 7, Payment Schedule.
[58] Trial Tr. vol. 2, 22:25-23:16.  Robin testified, in the course of describing a change order for a sump pump, that Laura was not comfortable paying cash and obtained a written receipt from Debtor "whenever" she paid cash.

though he had not secured Borough approval to proceed.  The Plaintiffs discovered several such misrepresentations when they obtained an actual schedule of inspections and passes from Michelle Wood of the Borough on or about March 8, 2010 (after they had fired the Debtor).[59]

The payments to the Debtor under the Contract proceeded as follows:

## 1.  **The First Payment**

The Plaintiffs caused a cashier's check to issue to CHDBC [sic] Inc. in the amount of $20,000 on June 27, 2008, which was substantially in accordance with the Agreement.[60]

## 2.  **The Second Payment**

The second payment of $20,000 due upon "submittal" for building permit is not addressed in the Plaintiffs' Post-trial Brief(s) or in the exhibits.  Exhibit P-13 indicates the Construction Permit was applied for on July 22, 2008,[61] the same date as the Dunlops' check to "cash."[62]  Thus, this payment was also in accordance with the Agreement.

## 3.  **The Third Payment**

The third payment of $50,000 was due upon the "start of demolition."  On or about August 1, 2008, the Debtor represented to the Plaintiffs "that he was ready and had the okay to start with demolition on the house."[63]  Accordingly, on August 1, 2008 the Plaintiffs issued a check for $50,000 from their joint account payable to CHDB Inc.[64]  Robin testified that Plaintiffs would not have made this payment "if that was not the truth."[65]  The Plaintiffs subsequently stopped by the Property in September 2008, saw "minimal demolition" and "not much" happening.[66]  Debtor told

---

[59] Trial Tr. vol. 1, 143:4-12; Ex. P-14, Project Inspection Activity Report for the Property, dated March 8, 2010.
[60] Ex. P-7, Cashier's Check drawn on KeyBank, N.A. dated June 27, 2008 for $20,000 and payable to CHDBC [sic] Inc.
[61] Trial Tr. vol. 9, 16:2-5.
[62] Ex. P-13.  The Construction Permit was actually issued on October 21, 2008.
[63] Trial Tr. vol. 1, 132:7-8.
[64] Ex. P-10, Check dated August 4, 2008 for $50,000 drawn on Plaintiffs' account and payable to CHDB Inc. (but labeled "4th pay" in the Index to Plaintiffs' Exhibits) (Dkt.  No. 103).
[65] Trial Tr. vol. 1, 132:9-10.
[66] Trial Tr. vol. 1, 133:8-10.

the Plaintiffs *after* he accepted the $50,000 check for the third payment that he had not yet obtained the permit for demolition.[67]  Robin testified that Debtor sent her an e-mail indicating that he had applied for the demolition permit on July 23, 2008 but "did not start demolition at the time he requested the check."[68]  Debtor started demolition on or about October 5, 2008, before he actually obtained the demolition permit on October 21, 2008.[69] Thus, this payment was made more than two months before demolition started and almost three months before the Debtor obtained the permit to do the demolition.  Further, this payment was not in accordance with the Contract, which required "[a]ll work to be done to state and local codes and approved by Owners."[70]  Thus, the Court finds that this payment was made as the result of Debtor's misrepresentation that he had the necessary approval to start demolition, even though he did not.

### 4.  The Fourth Payment

The fourth payment of $70,000 was due upon approval of the footing inspection by the Borough.[71]  Some time on or before November 10, 2008, the Debtor advised the Plaintiffs that the Property had passed the footing inspection so that the fourth payment was due under the payment schedule.[72]  Debtor testified that he advised the Plaintiffs that he had installed one footing and asserted at trial that installation of a single footing was all that was necessary to justify the fourth

---

[67] Trial Tr. vol. 1, 133:10-14.
[68] Trial Tr. vol. 1, 133:25-134:3.
[69] Trial Tr. vol. 1, 134:5-13, 136:8-12, 139:11-140:7.
[70] Ex. P-5, Proposal/SOW, Sec. L at ¶ 8.
[71] N.J.A.C. § 5:23-2.18(b)1(i)(1) and (ii)(1) ("Inspections") which states in relevant part:

> (b)  Inspections during the progress of work: The construction official and appropriate subcode officials shall carry out periodic inspections during the progress of work to ensure that work inspected conforms to the requirements of the code.
>> 1.  Inspections of one- and two-family dwellings for which construction
>>     must cease until the inspection is made shall be limited to the following:
>>>      i. The bottom of footing trenches before placement of footings; . . .

N.J.A.C. § 5:23-2.18(b)1(i)(1) (relevant section was in effect in 2008; N.J.A.C. § 5:23-2.18(b)1(i)(1) was amended in 2015 but is substantially the same).
[72] Trial Tr. vol. 1, 160:23-161:1.

13

payment based on the use of the singular word "footing" in Schedule K of the Contract.[73]  On November 10, 2008, the Plaintiffs issued a check in the amount of $70,000 from their joint account payable to CHDB Inc.[74]

In fact, the first footing pass occurred only on December 1, 2008, three weeks after Plaintiffs paid the Debtor $70,000.[75]  Thereafter, Debtor did not perform any work on other footings, never scheduled any additional footing inspection and never received any additional footing approvals.[76]  The Borough did not pass the Property on the final footing inspection until October 8, 2010,[77] nearly two years after Plaintiffs made the $70,000 payment and eight months after Debtor was fired.

At trial, the Debtor testified that in addition to only one footing pass being required under the terms of the Contract, there were changes to the Project that resulted in additional and changed footings.  However, there is no question that even the initial footing pass did not occur until three weeks *after* the $70,000 payment was made.  Further, there is no dispute that the initial footing inspection required additional work for approval or that at least a second footing was contemplated (as set forth in the Comments to the Inspection Report, where it states "ground wire req for 2nd footing").[78]  Nor is there any dispute that at least some additional footing inspections and passes would be required to complete the Project, irrespective of any changes.  Thus, the Court finds that this payment was not made in accordance with the Agreement and, further, that it was made on the basis of Debtor's misrepresentation that the footing inspection had passed on November 10,

---

[73] Trial Tr. vol. 10, 54:7-55:16; 59:18-60:12.
[74] Trial Tr. vol. 1, 161:2-7; Ex. P-16, Check dated November 10, 2008 for $70,000 drawn on Plaintiffs' account and payable to CHDB, Inc.
[75] Trial Tr. vol. 1, 165:17-19; Ex. P-14, Jan. 4, 2012 Project Inspection Activity Report (Amended Ex. P-14 was obtained during the litigation, was produced at trial, and contains entries after March 8, 2010.  Trial Tr. vol. 1, 162:2-6).
[76] Trial Tr. vol. 1, 165:8-166:11; Ex. P-14, Project Inspection Activity Report, at P1493.
[77] Trial Tr. vol. 1, 161:21-162:15, Ex. P-14.
[78] Ex. P-14 at P1493.

2008.[79]  In fact, the first footing inspection pass did not occur until December 1, 2008, three weeks

later.

Here, a recurring issue arises in this litigation as to whether a single inspection pass was

required under the Contract, which was the Debtor's position, or a final and complete pass was

required, as the Dunlops believed.[80]  Despite the use of the singular word "footing" on the Payment

Schedule, whether only a single footing inspection or a complete footing approval is required is

ambiguous.   To someone familiar with construction, construction terms and the municipal

approval process, the meaning may be clearer, though certainly not free from doubt in this Court's

view.  However, to someone not well-versed in the process, a reasonable interpretation is that a

complete inspection and approval is required.  Thus, as is described in more detail below, the Court

will look to extrinsic evidence, including the Contract as a whole and the parties' conduct, to

determine its meaning.

## 5.   **The Fifth Payment**

The fifth payment of $70,000 in cash was due upon approval of the slab inspection by the

Borough.  Because the renovation extended the footprint of the house, the Plaintiffs were required

to pour additional slab and to have it "inspected and then passed by the Borough."[81]  Robin issued

a check for $70,000 dated December 17, 2008 to CHDB Inc. because Debtor "told us that he had

gotten approval from the Borough for the slab," and Plaintiffs believed him.[82]  The full slab did

not pass inspection until June 1, 2010, after Plaintiffs became their own general contractors and

hired subcontractors to finish this work.[83]  However, a single slab inspection approval was in fact

issued on December 17, 2008, the same day the payment was made.  Thus, the issue of whether

---

[79] Trial Tr. vol. 1, 161:5-162:18, Ex. P-14.
[80] Trial Tr. vol. 1, 161:5-162:15.
[81] Trial Tr. vol. 2, 16:18-17:3.
[82] Trial Tr. vol. 2, 16:16-18; 17:4-13; Ex. P-20, Check dated December 17, 2008 for $70,000 drawn on Robin's
account, payable to CHDB Inc., and bearing the memo "payment #5."
[83] See, e.g., Trial Tr. vol. 2, 17:24-18:14; 18:22-19:1; Ex. P-14.

the Contract required a single pass on a slab inspection or that complete slab approval was required is once again the subject of a dispute between the parties.

As noted, the Debtor argues that only one pass was required for the payment to be due, and that the payment effectively constituted the "approval by Owner" required under the Agreement. Plaintiffs argue that this interpretation is unreasonable because there is no dispute that multiple slab approvals were required for the Project to move forward to completion, and also because the Debtor's interpretation disregards that additional requirement that the work "be done to state and local codes," as well as being approved by the Owner.  Plaintiffs further assert that Debtor's argument is undercut by Debtor's admission that he was not legally authorized to proceed with the Project without the necessary approvals, even though he requested payment from the Dunlops and, according to Robin, represented that he had the necessary approvals to do so.[84]  Robin also testified that she would not have made the payment if she knew that the entire slab had not been approved.[85] Robin did not learn until she saw the March 2010 Project Inspection Activity Report that the slab had not passed final inspection.[86]

With respect to these related issues, and considering all the evidence, the Court agrees with the Dunlops' argument that the approval required for a payment to be made under the Contract is not to be determined by the use of the singular "inspection" as opposed to the plural "inspections" in the SOW, but rather the entire Contract as a whole, which required that the construction proceed in accordance with all applicable law and codes, as well as the testimony of the parties as to their respective understandings and actions.  Consistent with this interpretation, the Activity Report as to the footings indicates that at least a second footing is required.[87]

---

[84] Trial Tr. vol. 12, 82:5-23 (as to installation of sheetrock and insulation); Trial Tr. vol. 2, 15:18-19:1.
[85] Trial Tr. vol. 2, 17:14-16.
[86] Trial Tr. vol. 2, 18:17-19; Ex. P-14.
[87] Ex. P-14 at P1493.

## 6.  **The Sixth Payment**

The sixth payment of $65,000 was due upon the start of framing (when electrical and plumbing were to start as well).  This payment was made by check on or about October 28, 2008. There does not appear to be any dispute as to this payment specifically, other than the same general argument by Plaintiffs that the Debtor was not authorized to proceed with framing without all the necessary prior approvals, which had not been obtained by that time.  Also, according to the testimony, this payment was made out of sequence because Debtor stated that he needed to purchase materials in order to begin framing and that he was ready to begin.[88]

## 7.  **The Seventh Payment**

As to payment number seven, which was due on the completion of framing and roofing, there was a modification due to a change order executed by the parties with respect to the "loft area."   This change order was required because the Debtor's framer incorrectly installed the framing over the kitchen/dining room area such that it became nearly a full-height room (where there was supposed to be only a crawl space).  This error also created a problem with the installation of second-floor windows.[89] As acknowledged by the parties, as a result of this framing error, Debtor agreed to provide certain additional "free" services to the Dunlops, as described in the change order.

Debtor advised the Plaintiffs that he had received an "initial" approval from the Borough as to the framing on the entire Property, except the loft area, which had not passed because it had not yet been framed pursuant to the change order and that the final approval would be obtained shortly.[90]  According to Robin, based on this representation by the Debtor, the seventh payment was made soon thereafter by check dated January 21, 2009 in the agreed-upon modified amount

---

[88] Trial Tr. vol. 1, 157:14-158:23, Ex. P-15, check dated October 28, 2008 for $65,000 bearing the notation "Payment #6."
[89] Trial Tr. vol. 2, 28:5-20.
[90] Trial Tr. vol. 2, 30:3-31:15; Trial Tr. vol. 7, 89:9-92:3.

of $63,200, based on the Debtor's representation that the Borough had approved his moving to the next stage of construction (sheetrock).[91] Ultimately, the Dunlops learned and Michelle Wood, the Borough Building Inspector, confirmed that the Borough did not issue initial or conditional approvals. Instead, the Borough makes only one complete framing inspection, which either passes or fails.[92] That final approval was not obtained until January 5, 2011, long after the Debtor was terminated.[93]

Robin testified that she would not have given her approval (consistent with Schedule K) or made this payment had she known that the Borough had not authorized Debtor to move forward.[94] Robin also understood that the Debtor could not have proceeded to the eighth phase of construction (sheetrock) if the Borough had not approved the framing, electric and plumbing.[95] Robin further testified:

> I confirmed it in an e-mail where we agreed to advance him the seventh payment on the condition that this additional room that was going . . . to be finished shortly . . . so that he could keep moving along with the project.[96]

---

[91] Trial Tr. vol. 2, 30:3-31:15; vol 7, 89:2-90:16; Ex. P-22, Check dated January 21, 2009 payable to CHDB, Inc. for $63,200 and bearing the legend "Payment #7." (Robin testified that Plaintiffs and Debtor agreed to reduce the payment from the scheduled amount of $65,000 but could not recall why. Trial Tr. vol. 2, 30:9-20).

[92] Trial Tr. vol. 7, 91:4-18; Trial Tr. vol. 9, 26:22-27:22.

[93] Trial Tr. vol. 2, 30:11-31:15; Trial Tr. vol. 9, 26:22-27:22.

[94] Trial Tr. vol. 2, 29:6-11; 39:20-40:4.

[95] Trial Tr. vol. 2, 31:6-15. At Trial Tr. vol. 2, 31:23-33:7, Robin describes a January 20, 2009 e-mail (Ex. P-3 at 56) from Robin to Debtor. This e-mail confirms that she is "advancing the 7th payment before our contract payment schedule" and asks that the following language be added to the receipt:

> The parties agreed that Owner's Eighth Payment shall be due upon completion of framing and roofing (rough electric/plumbing) with written approval by Owner, and start of sheet rock and siding as approved by Owner.
> …
> This language is basically from the contract and combines the requirements for both the 7th and 8th payments.

Robin testified that "the purpose of the e-mail was to confirm with [Debtor] about moving forward with finishing the loft space that was inadvertently constructed . . . . So because that wasn't a part of our original proposal, there was an additional charge that he wanted for finishing the room." Trial Tr. vol. 2, 33:1-7.

[96] Trial Tr. vol. 2, 28:24-29:3.

She testified that the rough electrical work and plumbing were to have been done by this time as well.[97]  The Plaintiffs later learned that the electricians used by the Debtor were not licensed, and the Borough did not issue a pass for the inspection.[98]  From the time that Debtor told Plaintiffs that the Property had passed framing inspection in January 2009 to the February 9, 2010 date when it actually passed, the Property failed the framing inspection five times.[99]  The Borough inspector did not even come out to inspect the framing for the first time (and the first failure) until many months after the Plaintiffs had paid the Debtor.[100]  This was another misrepresentation by the Debtor.

### 8.  **The Eighth Payment**

The eighth payment was to be $45,000 in cash due "[u]pon start of sheetrock and siding" and required approval of the Owner.[101]  Plaintiffs made the eighth payment (which Robin testified was essentially a combination of the requirements for payments seven and eight) by check number 98 dated July 11, 2009 for $45,000 drawn on a joint account and payable to CHDB Inc. with the notation "8th Pay. per schedule."[102]  Plaintiffs also made this payment based on Debtor's representation that the framing had passed inspection and that he could install the sheetrock and insulation.[103]  Even though the framing had not passed inspection, Debtor began to install the sheetrock.[104]

By this time, the Plaintiffs had paid Debtor about $300,000, and the house was to have been finished by July 21, 2009.[105]  Debtor had been telling Plaintiffs that the Project is "pretty

---

[97] Trial Tr. vol. 2, 29:12-14.
[98] Trial Tr. vol. 2, 29:24-30:2.
[99] Trial Tr. vol. 2, 40:7-16; Ex. P-14 (indicates that framing failed inspection on Sept. 1, 2009; Sept. 24, 2009; Sept. 30, 2009; Oct. 20, 2009; Nov. 17, 2009; Jan 15, 2010).
[100] Trial Tr. vol. 2, 40:15-19; Ex. P-14.
[101] Ex. P-5, Proposal/SOW, Sec. K, Payment Schedule.
[102] Ex. P-26.
[103] Trial Tr. vol. 2, 74:15-75:5.
[104] Trial Tr. vol. 2, 75:6-14.
[105] Trial Tr. vol. 2, 78:3-16.

much done" and asking them to bring over their finish materials. In reality, the Project was not close to completion at this time, as confirmed to the Plaintiffs by Booker and as was later acknowledged by the Debtor.[106]

### D. The July 25, 2009 *First Amendment to Contract Documents and the Extra Crews*

On June 18, 2009, Robin sent the Debtor an e-mail expressing her dissatisfaction with multiple aspects of the project including: failure to attain the correct ceiling height in the new basement; failure to protect a Sub-Zero refrigerator which was left sitting in water in the basement; failure to install a French drain and second sump pump; failure to keep the worksite clean.[107] As to the last item, Debtor was supposed to have supplied a garbage container for the building site and did not, until the Borough cited him for violating a municipal ordinance.[108] When Debtor did produce a container, it was full of construction debris from another site.[109] By this time, Debtor admitted that he was behind.[110]

In response to the Plaintiffs' concerns about construction delays, Debtor raised the idea of seeking to enroll the Project in the television show, Extreme [Home] Makeover and said that he would bring his three crews to the site to expedite the Project for the filming.[111] Debtor represented that HGTV had expressed an interest in filming him on a Jersey City project.[112] Plaintiffs liked the idea and believed his representations about the television interest and three crews, even though they had discovered at this point "that not everybody was his employee," including Jason Nicholas and the plumber.[113] Debtor told Plaintiffs that, if they advanced the remaining payments (nine

---

[106] Trial Tr. vol. 2, 78:3-12.
[107] Ex. P-3 at 72-73, June 18, 2009 e-mail.
[108] Trial Tr. vol. 2, 63:9-24; Ex. P-24, Feb. 19, 2009 letter from John Scialla at the Borough to Debtor.
[109] Trial Tr. vol. 2, 63:25-64:11.
[110] Trial Tr. vol. 2, 78:19-21.
[111] Trial Tr. vol. 2, 60:22-61:12.
[112] Trial Tr. vol. 2, 61:1-4.
[113] Trial Tr. vol. 2, 61:14-22. (Robin also testifies, "[W]e thought that we believed him," and "my mom and I were a little skeptical." Trial Tr. vol. 2, 61:14-15 and 61:23).

through thirteen), he would bring all his crews to the site to finish the Project in two to two-and-a-half months as well as constructing certain "extras" free of additional charge (custom closets, basement wet bar, certain landscaping).[114]

As a result of these events, the Plaintiffs and Debtor entered into the *First Amendment to Contract Documents* (the "First Amendment"), effective July 25, 2009.[115]  While the remaining payments on Schedule K (nine through thirteen) aggregated $145,000 and were tied to certain construction progress as outlined above, the amended schedule required $57,500 by July 25, 2009; $27,500 by August 7, 2009; $30,000 by August 21, 2009 (an interim aggregate of $115,000); $5,000 at the issuance of a certificate of occupancy by September 30, 2009; and $25,000 upon completion of building and landscape work by October 15, 2009, for a total of $145,000.[116]  The First Amendment indicates that all construction will be complete by the issuance of the certificate of occupancy on September 30, 2009, except for the finishing of the "bonus" room over the kitchen/dining area and certain work on the exterior drain.[117]  In the First Amendment there are no other conditions to the payment of these installments, and there is no mention of the alleged Extreme [Home] Makeover connection.[118]

Plaintiffs agreed to the First Amendment because Debtor "confirmed and agreed and promised us that he could have the house done in this time frame."[119]  Although the payments were not tied to construction benchmarks, Robin understood that Debtor would use the first payment, $57,500, to pay his workers "for the next couple of weeks, before the next payment was done" and that the last $25,000 was held back "as sort of an insurance that he would actually . . . complete

---

[114] Trial Tr. vol. 2, 61:10-12; 62:2-15.
[115] Ex. P-29, First Amendment.
[116] Trial Tr. vol. 2, 79:11-24; 80:16-24; Ex. P-29, First Amendment.
[117] Ex. P-29, First Amendment at ¶ 8.
[118] Ex. P-29, First Amendment.
[119] Trial Tr. vol. 2, 80:25-81:2.

the project."[120]  Plaintiffs were "very excited," "felt like we were back on track with [Debtor],"

and Robin told her lighting store vendor about the Extreme Makeover "home make-over type of

thing."[121]  On July 25, 2009, the Plaintiffs timely paid the Debtor $57,500, via check in the amount

of $42,500 dated July 25, 2009 from their joint account to CHDB with the legend, a/c 25

Christopher Place, Saddle River and $15,000 in cash, both acknowledged in a receipt signed by

Debtor and dated July 25, 2009.[122]

By August 2009, Plaintiffs had not seen much progress on the Project.  Nonetheless, Debtor

asked them to order kitchen cabinets "because [Debtor will] be hanging sheetrock

momentarily."[123]  Although Plaintiffs' designer did not want to deliver the $34,000 wood cabinets

until Debtor was ready to install them (she wanted to deliver them inside the house), Debtor

insisted on having them because he did not want to be "slowed down" by not having the finish

materials on site.[124]

Plaintiffs timely paid Debtor $27,500, the second installment under the First Amendment,

by check dated August 7, 2009, again based on the understanding that Debtor needed the money

to pay his workers.[125]  On August 12, 2009, Plaintiffs also paid CHDB a $10,131.99 balance on a

change order for masonry materials.[126]

On August 30, 2009, Robin wrote to Debtor again in frustration over lack of progress at

the Project:  no work crews on site on Saturday, August 29; no trash dumpster; rainwater in the

basement; building not secured, as a neighbor reported that he had walked through examining the

---

[120] Trial Tr. vol. 2, 81:1-20.
[121] Trial Tr. vol. 2, 82:3-15.
[122] Trial Tr. vol. 2, 84:16-86:3; Ex. P-30.
[123] Trial Tr. vol. 2, 89:17-24.
[124] Trial Tr. vol. 2, 90:12-25; 95:25-96:7.
[125] Trial Tr. vol. 2, 91:3-92:12; Ex. P-32.
[126] Trial Tr. vol. 2, 92:13-93:9; Ex. P-33.

construction.[127]  Robin also demanded to see Debtor's $3 million certificate of insurance.[128]  On September 30, 2009, Booker wrote Debtor a long list of construction still to be finished and queried whether there were inspection tickets for the framing and plumbing and whether the roof was finished.[129]  Thus, the Debtor failed to meet the agreed-upon September 30, 2009 construction deadline as well, one that this Court finds he did not believe he could meet when he agreed to that deadline.  Similarly, the Court finds that the Debtor did not intend to bring extra crews to the site at the time he agreed to do so, nor did he believe that the Project would be part of an Extreme [Home] Makeover show at the time he made those representations.

By this time, Plaintiffs had "figured out" that the Project had not passed its framing inspection, and Plaintiffs, Booker, Jason Nicholas, and Glen McCreedy [a civil engineer] were "all . . . pretty frustrated" with Debtor, so Plaintiffs called a meeting with Debtor, McCreedy, Michelle Wood [Borough Inspector] and themselves in December 2009 (Booker was unable to attend the meeting).[130]  Robin felt that Debtor was not only violating the Contract but "specifically trying to hurt us" though they had done everything he requested and "paid him . . . basically, every dime he had requested."[131]

### E.  Plaintiffs' October 30, 2009 Notice of Breach

On October 30, 2009, Robin issued Debtor, as President/Owner of CHDB Inc. and Grounds Design and Build, LLC, a three-page notice of material breach of certain enumerated Contract documents and specifically for: (i) failure to provide evidence of $3 million in commercial general liability insurance; and (ii) failure to adhere to the project timeline and demanded $337,825 in liquidated damages consisting of six scheduled payments from the sixth payment and forward; and

---

[127] Trial Tr. vol. 2, 93:21-94:25; Ex. P-3 at 84-85, Aug. 30, 2009 e-mail.
[128] Trial Tr. vol. 2, 95:18-24.
[129] Trial Tr. vol. 2, 96:24-97:10; Ex. P-3 at 91, Sept. 30, 2009 e-mail.
[130] Trial Tr. vol. 2, 99:20-100:10.
[131] Trial Tr. vol. 2, 100:13-19.

23

four payments for change orders.[132]  The letter advised that Plaintiffs would deduct $5,067.38 from the remaining $30,000 due under the First Amendment ($5,000 on issuance of the Certificate of Occupancy and $25,000 by October 15, 2009) on a monthly basis until that $30,000 balance was depleted.[133]

Robin intended for this letter "to put fire under [Debtor] and to get him moving with – to continue moving with our project and to give him more or less an official or formal slap on the wrist with what had been happening thus far."[134]  Robin started the tally of damages with the sixth payment "because that's when we started to find out there [were] problems with . . . him not passing and not getting the requisite approvals to move forward, or when we suspected."[135]  Robin testified that Laura and she continued to work with Debtor after she sent this letter because they had paid their money and wanted him to finish the job.[136]  Plaintiffs made a final cash payment of $3,744.12 to Debtor, through its office employee, to purchase a fireplace sleeve from a vendor with whom Debtor had a relationship.[137]

As indicated above, the Plaintiffs, Nicholas, Michelle Wood, Glen McCreedy and the Debtor convened a meeting at the Property in December 2009.[138]  Robin reported Borough representative Michelle Wood as "screaming" at Debtor "about things that she had told him to do that he hadn't, as well as things that he should have known better than to not do before calling her for an inspection."[139]  Robin e-mailed the attendees as well as Booker on the following day outlining a program to finish the Project.[140]

---

[132] Trial Tr. vol. 2, 101:17-102:14; Ex. P-36.
[133] Ex. P-36 at 3.
[134] Trial Tr. vol. 2, 103:1-13.
[135] Trial Tr. vol. 2, 105:3-17.
[136] Trial Tr. vol. 2, 105:18-106:1.
[137] Trial Tr. vol. 2, 106:2-107:14; Ex. P-37, Nov. 19, 2009 receipt for $3,744.12.
[138] Trial Tr. vol. 2, 108:25-109:10.
[139] Trial Tr. vol. 2, 109:11-15.
[140] Trial Tr. vol. 2, 109:16-21.

### F.  __Plaintiffs' Termination of the Debtor and Completion of the Project__

The Plaintiffs reached the limits of their patience near the end of 2009 or beginning of 2010.[141]  During a discussion about landscaping, in the presence of Booker, Debtor again showed the Plaintiffs the photographs that he had on his laptop before the parties signed the Contract.[142] When Robin asked him about details in one of the photographs, Debtor admitted that he did not do all the work about which she was asking.[143]  While Debtor minimized the discrepancy ("it . . . wasn't any big deal"), Plaintiffs were "taken aback" and "speechless,"  "because we had looked at those photos almost two years prior and he had told us that he had done the work that was in those photos."[144]  For his part, the Debtor argued that at this time, the Project was finally near completion.  However, the facts demonstrate otherwise, as the Dunlops were forced to spend hundreds of thousands of dollars to correct work improperly done, complete the work the Debtor did not and could not finish, and replace materials Debtor had failed to store or secure properly.

Plaintiffs fired the Debtor in February 2010, because they had "caught him in a number of lies over the course of the relationship," because he had "kept up the façade" and was "stringing us along."[145]  Plaintiffs had discussed firing him sooner, but because they had "given him all our money," had not gotten value for it, and were not sure that they could find someone to resume where he left off, they "tried to stick it out."[146]  Plaintiffs subsequently found out about some of the inspection failures (in particular, they knew that framing had not passed), but did not see the Project Inspection Activity Report (which was first dated March 8, 2010) until after they fired the Debtor.[147]

---

[141] Trial Tr. vol. 2, 110:1-9; 111:1-112:10.
[142] Trial Tr. vol. 2, 111:1-7.
[143] Trial Tr. vol. 2, 111:4-10.
[144] Trial Tr. vol. 2, 111:10-112:4.
[145] Trial Tr. vol. 2, 112:13-17.
[146] Trial Tr. vol. 2, 112:13-113:2.
[147] Trial Tr. vol. 2, 113:3-8; 113:14-21.

Plaintiffs requested a refund of some monies.  CHDB Inc. issued check number 3141 for $2,874.40 on January 31, 2010 from its purchasing account at Bank of America payable to Robin.[148]  It was dishonored.  CHDB Inc. issued replacement check number 3142 for $2,874.40 on February 28, 2010 from its purchasing account payable to Robin.[149]  It, too, was dishonored.[150]  At around this time, Robin threatened to sue Debtor "if he didn't do the right thing with our project.  And he told me to go ahead and sue him because all of his companies were shells and nothing was in his name."[151]  Although Debtor represented that he was using the funds that the Plaintiffs paid him to finish the Project, even after Debtor had worked on the Property "20-some-odd months," it still had not passed the complete framing inspection.[152]

### G.  The Debtor's Use of the Payments by the Dunlops

Robin was not able to ascertain, while inspecting Debtor's corporate Bank of America statements from late 2008 through early to mid-2011 when the account closed, precisely what Debtor had done with Plaintiffs' money.[153]  Of the "thousands" of Debtor's checks which Robin reviewed from this three-year period, Robin estimated that 25%-40% were payable to cash ($100,000 in 2008 alone).[154]  The checks payable to cash in 2009 totaled "a little over $400,000" and were "very minimal" in 2010 and 2011 when "[Debtor] was winding down his accounts . . . there really wasn't anything there by the time 2011 hit."[155]  Robin clarified, "It looked like . . . he was depleting the accounts.  There was very little, if anything, going in.  But he was consistently taking money out."[156]  In the August 2009 Bank of America bank statement, for example, Robin

---

[148] Trial Tr. vol. 2, 113:8-13; 114:23-116:1; Ex. P-39.
[149] Ex. P-39.
[150] Ex. P-39.
[151] Trial Tr. vol. 2, 118:12-16.
[152] Trial Tr. vol. 3, 142:21-143:9.
[153] Trial Tr. vol. 3, 137:20-138:9; 142:21-143:12; Ex. P-60.
[154] Trial Tr. vol. 3, 143:13-25; 146:5-15.
[155] Trial Tr. vol. 3, 157:9-16.
[156] Trial Tr. vol. 3, 157:20-22.

noted a counter deposit on August 3, 2009 in the amount of $43,611.49 that included Plaintiffs'

payment to Debtor in the amount of $42,500; followed by a withdrawal and transfer on August 14,

2009 in the amount of $43,000 to an account which ended in 1715 and that Robin established

belonged to Debtor's wife, Kyoung Kim (appearing as "Kyong Kim" in the trial transcript).[157]

## H.  The Post-Firing Inspections and Work

After firing the Debtor, the Plaintiffs engaged Andrew Yarmus of A.B.L. Inspections

("Yarmus") to document the status of the construction and the condition of the Property.[158]  The

Plaintiffs had engaged Yarmus to inspect a prior property in 2007.[159]  He produced a February 26,

2010 report consisting of "photographs and narratives."[160]  Based on the report and her own

observations, Robin testified that:

> At this point, my mother and I had purchased a significant
> amount of the finished materials that were either in the garage or
> outside on the -- in the dirt, outside of the house.  And Andrew
> [Yarmus] was quite surprised by that.[161]

The septic system had not been connected to the house.[162]  Robin testified that these photographs

in part show: (i) that Debtor had not performed tasks for which he had received progress payments,

such as installing sheetrock and insulation and connecting the septic system (rough plumbing); and

---

[157] Trial Tr. vol. 3, 151:7-14; Trial Tr. vol. 3, 161:19-162:11; Ex. P-60, 08/31/09 Stmt. at 2; Ex P-30, check #102 for $42,500 dated 07/25/09 and payable to CHDB; Ex. P-60, 8/31/09 Stmt. at 5.  The Bank Statements in Plaintiffs' Exhibit P-60 were produced by Andrew Levy, Operations Analyst and Bank Officer at Bank of America; Mr. Levy described himself as "custodian of records for the Northeast Region," who "testif[ies] in court on behalf of the bank whenever bank documents are subpoenaed." Trial Tr. vol. 4, 4:15-16; 5:5-9.  Mr. Levy produced the records in Exhibit P-60 on February 4, 2016 in response to Plaintiffs' December 2, 2015 subpoena. Trial Tr. vol. 4, 6:5-18.  Mr. Levy indicated that he also produced the documents in Plaintiffs' Exhibit P-61.  In his colloquy with Mr. Campbell, Mr. Levy describes the documents in Exhibit P-61 as checks, whereas they are actually bank statements. Trial Tr. vol. 4, 8:2-9:8; Ex. P-61.  Mr. Levy clarifies on cross-examination that the checks that correspond to the Exhibit P-61 bank statements are on disks, which he brought with him. Trial Tr. 4, 9:18-10:16.
[158] Trial Tr. vol. 3, 19:8-24.
[159] Trial Tr. vol. 3, 19:14-17.
[160] Trial Tr. vol. 3, 19:20-24; Ex. P-38.
[161] Trial Tr. vol. 3, 21:2-5.
[162] Trial Tr. vol. 3, 22:8-9.

(ii) that Debtor had performed tasks which he was not authorized to do, such as tiling the bathroom when the framing had not yet been approved.[163]

Plaintiffs experienced significant difficulty in engaging another general contractor to undertake the Project based on "the incomplete and incompetent work that had been done."[164] Plaintiffs effectively became the general contractors on the Project.[165]  They attempted to engage some of Debtor's employees and did directly hire Nicholas, the architect.  Rick Eichenlaub, of RL Engineering, Inc. ("Eichenlaub"), was also retained because of Michelle Wood's concerns over the structural elements.[166]  Eichenlaub also prepared a three-page report, dated August 10, 2010, of his two-day field inspection of the Property (the "Eichenlaub Report").[167]  The Eichenlaub Report noted at least twelve structural deficiencies on the Project, primarily in the first-floor framing.[168]  Debtor registered with the Borough that a licensed electrician named Arturo Buchanan was on the Project but in fact used two other persons named Henry and Roman Fatig/Fatav,[169] whom Debtor represented were on his payroll.[170]  The Plaintiffs retained a new electrician, Emmanouil Zervakis of EIZ Contractors, Inc., who sent the Borough Building Department a November 1, 2010 letter, which said that he was "repairing the existing defective work. . . .  Such problems are the laundry and lighting on the same circuit, Bathroom GFI receptacles on the smoke

---

[163] Trial Tr. vol. 3, 26:7-25.
[164] Trial Tr. vol. 3, 27:21-28:3.
[165] Trial Tr. vol. 3, 31:15-17.
[166] Trial Tr. vol. 3, 28:4-7; 29:13-30:6.  (Robin testified, without objection from Debtor's counsel, that "[Debtor] told [his workers] that if they did any work for us, that he would not pay the monies that he owed them and he had intended upon breaking us, breaking my mother and I so that we would not be able to finish the house."  Trial Tr. vol. 3, 29:9-12.  Robin testified later, without objection from Debtor's counsel, that Daniel Cordero, Debtor's "unlicensed mason," whom Plaintiffs retained after firing the Debtor, told Plaintiffs "that [Debtor] said to him that he was going to break my mother and I."  Trial Tr. vol. 3, 69:14-70:5.
[167] Trial Tr. vol. 3, 36:25-38:8; Ex. P-43.
[168] Ex. P-43.
[169] Trial Tr. vol. 3, 41:18-25.  Record not clear as to correct spelling of names.
[170] Trial Tr. vol. 3, 42:2-10. Robin testified that Buchanan refused to come near the Property and ultimately removed his own name from Borough records as electrician on the Project.

detectors, buried boxes and more buried boxes. This in fact is one of the worst jobs we have ever seen."[171]

On December 29, 2010, Eichenlaub issued a second letter (addressed to Robin) opining that the framing defects had been corrected by Plaintiffs' substitute subcontractor, Otto Salazar, following Eichenlaub's November 17, 2010 inspection of the Property.[172] Eichenlaub copied this letter to Michelle Wood at the Borough.[173] On January 5, 2011, the Property passed the Borough framing inspection.[174] Plaintiffs obtained their Certificate of Occupancy in October 2011.[175]

## I.   The State Court Action

On or about March 24, 2010, the Plaintiffs, through counsel, filed a six-count complaint (the "Complaint") against the Debtor and CHDB, Inc., in Superior Court of New Jersey, Law Division, Bergen County, Dkt. No. BER-L-2826-10, for: (1) violations of home improvement practices regulations; (2) various violations of New Jersey's Home Improvement Contractor Regulations, N.J.A.C. § 13:45A-16.2 and 17.1; (3) breach of contract; (4) rescission; (5) breach of the covenant of good faith and fair dealing; and (6) unjust enrichment (the "State Court Action or Litigation").[176] The State Court Complaint alleged that the Plaintiffs had paid the Debtor $575,038.88, including more than $300,000 for work not completed, and demanded liquidated damages from October 30, 2009 and forward.[177] The Debtor, through counsel, filed an Answer and eight-count Counterclaim alleging that Plaintiffs failed to pay monies due and owing, breached covenants of good faith and fair dealing, and the like.[178]

---

[171] Trial Tr. vol. 3, 44:7-45:13; Ex. P-45.

[172] Trial Tr. vol. 3, 39:19-40:18 (retention of Otto Salazar); 47:2-48:10; Ex. P-46, Dec. 29, 2010 letter from Eichenlaub. The letter also pronounces as satisfactory two items originally deemed defective by Eichenlaub in his August 10, 2010 letter.

[173] Ex. P-46.

[174] Trial Tr. vol. 3, 48:23-49:4; Trial Tr. vol. 9, 26:18-27:13; Ex. P-14. Michelle Wood explains in the second transcript citation why January 5, 2011, not December 21, 2010, is the correct date.

[175] Trial Tr. vol. 3, 51:10-15.

[176] Trial Tr. vol. 3, 31:23-32:25; Ex. P-40.

[177] Ex. P-40, Compl., ¶¶ 26, 40.

[178] Trial Tr. vol. 3, 33:1-25; Ex. P-41.

The parties in State Court engaged in discovery.  Plaintiffs produced about 2,000 pages in response to Debtor's demands ("we answered everything").[179]  Debtor did not produce any documents, and Plaintiffs believe that he returned no answers to interrogatories (none were introduced into evidence).[180]

Robin testified that she originally demanded only $300,000 in the State Court Complaint (the payments due from the sixth payment and forward) because that was work for which the Plaintiffs had paid and understood that Debtor had not performed.[181]  Plaintiffs did not understand the extent to which the work had been done poorly.[182]  When Plaintiffs' State Court attorney filed their Request for Entry of Default Judgment (dated June 16, 2011), counsel indicated that Plaintiffs had asked Debtor to return $300,000 and that he did not have it.[183]  Plaintiffs then calculated their damages to be:  (i) $243,357.57 to correct Debtor's faulty work; (ii) $125,671.11 to replace finish products and other goods damaged by the Debtor; (iii) $419,650.62 to complete the Project; and (iv) $577,438.88 refund of the monies paid to the Debtor based on rescission of the Contract, for an aggregate $1,366,118.18, trebled to $4,098,354.54 under the New Jersey Consumer Fraud Act, plus $34,218.75 in attorneys' fees and costs, for a total of $4,132,573.29 plus post-judgment interest.[184]  Robin appeared before the State Court at a proof hearing on Plaintiffs' request for entry

---

[179] Trial Tr. vol. 3, 34:10-13.

[180] Trial Tr. vol. 3, 34:6-18.

[181] Trial Tr. vol. 3, 52:19-53:21; Ex. P-40; Ex. P-47, Atty. Cert. in Support of Entry of Default Judgment dated June 16, 2011.

[182] Trial Tr. vol. 3, 53:14-16.

[183] Trial Tr. vol. 3, 53:16-21; Ex. P-47, Atty. Cert. in Support of Entry of Default Judgment, ¶ 16.

[184] Trial Tr. vol. 3, 54:4-55:24; 57:19-58:10; Ex. P-47, Atty. Cert. in Support of Entry of Default Judgment, ¶¶ 21-32. Robin testified at length about the damages listed in the Attorney Certification in Support of Entry of Default Judgment as a function of "the corrective work that we had to do in order to fix the work [Debtor] had done."  Trial Tr. vol. 3, 58:20-21; and generally Trial Tr. vol. 3, 58:22-80:16.  Robin also testified at length about extensive finish products (cabinets, tile, and the Sub-Zero refrigerator) which were delivered to the Property, never installed, not properly maintained, and ultimately needed to be replaced.  Trial Tr. vol. 3, 78:14-79:11; 85:7-95:25; Ex. P-47, Atty. Cert. in Support of Entry of Default Judgment, Ex. C.   Robin prepared Exhibit B ($243,357.57 in payments for corrective work); Exhibit C ($125,671.11 in payments for finish goods destroyed and replaced); and Exhibit D ($419,650.62 in payments to finish the Project) from her own records ("I'm a very organized person and I keep . . . records").  Trial Tr. vol. 3, 59:18-61:5; 60:2-3; 104:23-25; 105:15-106:9; 117:22-118:19 (explaining the damages calculation in State Court).

of default judgment and testified to this demand.[185]  Plaintiffs' attorneys sent notice of the default

judgment hearing to the Debtor's counsel and attempted to send it to the Debtor at two different

addresses.  Debtor claims he never received the notice.  Debtor also asserts that his attorney had

withdrawn from the case at this point, but no independent evidence of any withdrawal was

provided.

On August 1, 2011, the State Court entered default judgment against Debtor and against

CHDB, Inc. in the amount of $4,135,330.05 plus post-judgment interest pursuant to N.J.R. 4:42-11

(the "Judgment").[186]  Plaintiffs attempted to collect the Judgment from the Debtor, who had moved

to London in order to attend business school, but were unable to collect any funds.[187]  Plaintiffs'

collection efforts ceased when they received notice that the Debtor had filed the instant bankruptcy

case.[188]

## J.   The Bankruptcy Case

The Debtor filed a voluntary Chapter 7 bankruptcy petition on August 16, 2012 through

counsel.[189]  Debtor scheduled $1,090 in assets (all personalty) and $815,020 in general unsecured

claims.  The schedules stated that Debtor owed only $575,038 to the Plaintiffs.[190]  The debt was

scheduled as a business debt and was not scheduled as contingent, liquidated or disputed.

Although the Judgment had been entered a year earlier, Debtor scheduled the State Court Action

on the Statement of Financial Affairs, ¶ 4a, with the status "pending."[191]  The Debtor certified that

he was unemployed and listed his address as 259 Edgewood Street, Ridgewood, New Jersey

---

[185] Trial Tr. vol. 3, 119:16-120:5; Ex. P-48, Proof Hr'g Tr., Dkt. No. BER-L-2826-10, July 27, 2011.
[186] Trial Tr. vol. 3, 127:19-22; Ex. P-49. In entering the Judgment, the State Court judge openly suggested that the Debtor's actions may be criminal. Ex. P-48, State Court Hr'g, Tr. 32:2-9.
[187] Trial Tr. vol. 3, 128:16-129:24.
[188] Trial Tr. vol. 3, 130:2-5.
[189] Ex. P-51, Petition.  Kim M. Lynch, Esq., of Forman Holt, substituted for Robert H. Johnson, Esq., in the main case (Main Dkt. No. 6).
[190] Ex. P-51, Petition, Sch. F. Debtor also scheduled $120,775 in student loans, of which he labeled $26,632 as "business debt."
[191] Ex. P-51, Petition, SoFA, ¶ 4a.

(Schedules I and J show a deficit of $2,600/month).[192]  The Plaintiffs attended the 341 meeting of

creditors.[193]  Chapter 7 Trustee Jonathan Kohn, Esq., filed a Report of No Distribution on January

29, 2013.  No discharge has been granted, and the case remains open.

### K.   The Adversary Proceeding and Procedural History

The Plaintiffs, through prior counsel Louis D. Tambaro, Esq., timely filed the instant

adversary proceeding as a two-count Complaint for: (i) "declaratory relief" for violation of the

New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-1 *et seq.*; (ii) denial of discharge under 11 U.S.C.

§ 727(a)(1)-(7);  and  (iii)  judgment  excepting  the  debt  from  discharge  under  11  U.S.C.

§ 523(a)(2)(A) and (B).[194]

After two motions to dismiss, the Court (Judge Stern), by Order entered on May 14, 2013,

dismissed with prejudice Count Two (exception to discharge under 11 U.S.C. § 523(a)(2)(B));

Count Four (denial of discharge under 11 U.S.C. § 727(a)(3)); and Count Five (denial of discharge

under 11 U.S.C. § 727(a)(4)(A)) and allowed the Amended Complaint to proceed on Count One

(exception to discharge under 11 U.S.C. § 523(a)(2)(A); Count Three (exception to discharge

under 11 U.S.C. § 523(a)(6); and Count Six (violation of the New Jersey Consumer Fraud Act,

N.J.S.A. § 56:8-1 *et seq.*)[195]

On August 30, 2016, Debtor and Plaintiffs each filed a motion *in limine*.  The Debtor

moved to bar the Plaintiffs from introducing testimony of non-party former customers of Debtor:

(i) Seng Liew and Suzanah Lee; (ii) Jacob and Glenn Bin Sadigh; (iii) Miranda Sherwin, Joshua

Feldman and James Sherwin; and (iv) Renate Felsner (as well as to allow Ms. Felsner to testify at

---

[192] Ex. P-51, Petition at 2.  Debtor listed his prior addresses for the last three years (as required by the SoFA) as:  359
Upper Boulevard, Ridgewood, NJ 07450 (August 2010-September 2011); 424 Oak Street, Ridgewood, NJ 07450 (July
2009 through August 2010); and 253 Hillsdale Avenue, Hillsdale, New Jersey (June 2005 through June 2009).  Ex.
P-51, Petition, SoFA, ¶ 15.
[193] Trial Tr. vol. 3, 135:24-136:3.
[194] The sections 727 and 523 claims were combined into a single count (Dkt. No. 1).
[195] Dkt. No. 21, May 14, 2013 Order.

trial via videoconferencing).[196]  The Plaintiffs moved for a ruling that the Debtor had spoliated evidence based on his statements in his May 13, 2014 deposition that he had discarded the computer that contained the photographs of renovation projects which he claimed he had performed and which he showed Plaintiffs to induce them to contract with him; or, in the alternative, for a negative inference under FED. R. CIV. P. 37(e)/FED R. BANKR. P. 7037.[197]

By Order entered on September 26, 2016, the Court prohibited Miranda Sherwin from testifying at trial but allowed Renate Felsner to testify via video conferencing for certain limited purposes.[198]  At the same hearing on September 20, 2016, the Court granted Plaintiffs' *in limine* motion for an adverse inference based on Debtor's admitted destruction of documents and information, with the scope of the adverse inference to be determined after trial.[199]  The trial began on September 21, 2016 and continued for twelve days.

### L.  **Debtor's Destruction of His Records and His General Lack of Credibility**

The Debtor initially testified (at deposition) that he destroyed and/or discarded all his business and computer records in 2009 or 2010 by throwing them in a dumpster (at a location he could not recall).[200]  The destruction was extensive, apparently complete and plainly intentional as Debtor testified at trial that he also shut down his website and destroyed all of his and his company's paper and electronic business records dating back to the start of his business.[201]  Besides the serious issues relating to the destruction of those records as a general matter, Debtor's testimony in these regards was at least inconsistent in at least two material respects.

---

[196] Dkt. No. 90, Debtor's motion *in limine*.
[197] Dkt. No. 91-1, Pls.' Br. at 1-3.
[198] Dkt. No. 107.
[199] Dkt. No. 141, Sept. 20, 2016 Hr'g Tr. 33:3-9; 35:21-23.  The Plaintiffs' motion was marked "Order to be Submitted" on Sept. 20, 2016, but no Order was submitted or entered.
[200] Ex. P-56, Kim Dep., (vol. 2), May 13, 2014; Tr. 38:19-39:16; 41:14-42:2; 67:8-68:12.
[201] Trial Tr., vol. 10, 172:20-173:11.

First, his testimony admittedly changed as to when he destroyed these extensive records. He initially testified that it was as early as 2009, well before the Dunlops filed suit against him in 2010, and while he was still working on various construction jobs, including the Dunlops' (until February 10, 2010).[202]   This makes no sense and is contrary to Debtor's other testimony to the effect that he had no intention of leaving the construction business in 2009.

Perhaps recognizing this inconsistency (or worse), Debtor subsequently certified and testified that he did not destroy the documents until sometime in 2010, most likely shortly after the time the Dunlops filed their State Court Complaint against him and his companies in March 2010.[203]  In his September 7, 2016 Certification, Debtor refers to his own testimony indicating that the destruction took place after he had consulted with a bankruptcy attorney, which occurred after the Dunlops had filed their State Court lawsuit in March 2010.[204]  No specific time frame for the consultation or destruction was given other than some time "shortly" after March 2010.  But what is clear is that Debtor destroyed all his records while he was involved in various litigations and contemplating a bankruptcy filing.

Then, at the trial on cross-examination, Debtor pushed back the date of the destruction again, this time to the summer of 2011.

Q     Just because it's -- it -- I brought up the topic, we were on it, so I thought why don't we just see if we can finish it up. The -- the destruction of records that occurred, you had testified  during your deposition that it was 2009/2010, is that correct?

A     That is one of those areas that I misspoke. Uh, I destroyed those records probably around the summer of 2011, I believe.

Q     Isn't it true that during your deposition, you actually said it about two or three times that you had destroyed them in 2009/2010?

A     That I don't recollect.

---

[202] Kim Certif. in Opposition to Plaintiffs' Motion *in limine*, at ¶ 6, Sept. 7, 2016 (Dkt. No. 92).
[203] *Id.* at 6, 8; Trial Tr. vol. 10, 172:20-173:11.
[204] Kim Certif., at ¶¶ 6-10, Sept. 7, 2016 (Dkt. No. 92).

Q       So you had just testified that now you believe that it was 2011?

A       Yes, summer of 2011, I believe.

Q       Summer of 2011.

A        Yes.

Q       What was going on in the summer of 2011 that prompted you to do that?

A       I decided at that point the thing that I loved, I love design, I love architecture, it was not something that I loved anymore; it was painful. So I decided to change careers. And so at that point, I got legal advice, and things of that sort, and I decided, you know, let's - - you live your life only once, and I thought, you know, for me, my wife and I had a great opportunity where she had an opportunity to go to London, and it coincided, so it's a great time, and for us, we decided at that point just to clean everything up, move on, and restate [sic] in London.[205]

The summer of 2011 is still a full year before Debtor actually filed for bankruptcy protection in August 2012, but is also at a time when even more litigation was pending against him and his companies [206] and the Dunlops were getting close to a judgment due to Debtor's failure to provide discovery. Based on this shifting testimony and Debtor's general lack of credibility, the Court finds that Debtor destroyed the documents and electronic information at a time when various litigations were pending and as he was contemplating a bankruptcy filing.

Further, in connection with a related line of questioning, Debtor admitted that he knew the destruction of documents was wrong:

Q       Well, this is very interesting. It is a completely different testimony from your Wednesday testimony, wouldn't you agree?

A       No, I would say if you go back to the testimony in there, *what you will hear is I said we got advice from a lawyer and then, I think after that advice, I don't think any accountant or bankruptcy accountant would  tell you advice to do that* [i.e., destroy documents].  *One, I*

---

[205] Trial Tr. vol. 10, 172:20-173:23.
[206] See Statement of Financial Affairs, Item 4, listing five separate litigations at the time of the Debtor's filing.

> *think it's illegal.* I don't know what the repercussions. What I said
> was those, he gave me fully sound advice, what to do and then from
> that, I decided you know I'm going to school.  I'm moving on with
> my life and you know start a clean slate and that's what we did.[207]

Next, as the testimony above indicates, Debtor initially sought to, at least, indirectly place the blame on his attorneys for his decision to destroy all his documents.  Debtor rationalized that once he determined to file for bankruptcy "there was no longer any reason to defend the lawsuit," "defend any litigation with my former customers," or, in a significant leap, "retain any records relating to my construction business."[208]  In a further effort to explain his conduct -- and lay the blame elsewhere -- Debtor had previously stated that "I was never informed by my litigation counsel or potential bankruptcy counsel that I had any need to retain any documents relating to my dealings with the Dunlops or other parties."[209]  In this regard, Debtor testified that: "I got counsel that said, you know, if you file for bankruptcy you don't have to worry about this stuff."[210]

The Court finds these rationalizations and explanations for Debtor's destruction of his records are not credible or complete.  First, the pendency of litigation is a reason to keep documents, not destroy them.  In fact, the default judgment was entered against him in State Court based at least in part on Debtor's failure to provide discovery.[211]  Thus, Debtor knew that he was required to provide documents and information in discovery and that there were repercussions for failing to do so.  Second, as demonstrated by his own testimony cited above, Debtor thought the destruction of documents or at least giving advice to do so was "illegal."

---

[207] Trial Tr. vol. 11, 177:16-178:2 (emphasis supplied; bracketed language added).
[208] Kim Certif., at ¶¶ 9-10, Sept. 7, 2016 (Dkt. No. 92).
[209] Kim Certif., at ¶ 10, Sept. 7, 2016 (Dkt. No. 92).
[210] Ex. P-56, Kim Dep., (vol. 2), May 13, 2014, Tr. 38:22-39:9, also at Kim Certif., Ex. A, Sept. 7, 2016 at ¶¶ 9 -10. (Dkt. No. 92).
[211] Ex. P-47 at Ex. F, Request for Entry of Default for failure to produce discovery, dated March 11, 2011.

Next, when pressed as to whether any attorney had advised him that it was not necessary to keep any documents, Debtor became evasive but ultimately demurred and indicated he had not received any such advice:

> Q      So you're saying that when you testified on Wednesday and when I asked you a question why did you throw out the documents and your response was on the advice of counsel, you're saying that that is no longer the case?
>
> A      Then I misspoke. I did not mean by advice of counsel. What I meant was, I made my own decisions after that. Okay, he gave me good advice throughout. Like here's an example --[212]

In sum, Debtor ultimately retreated from his "blame the attorneys" defense or "explanation" for the destruction of his records by acknowledging that: (i) his counsel did not advise him to destroy any documents; (ii) he "made his own decisions after that," including the destruction of documents; and (iii) perhaps most significantly, that he knew the destruction was "illegal."  This retreat makes sense from the Court's view because if those attorneys were called to testify (as was a possibility at trial when Debtor appeared to be relying on the advice of counsel as a defense or justification for his destruction of documents, but then abandoned that course), his attorneys undoubtedly would have indicated that they would not have advised Debtor that he should destroy any documents.  Instead, if asked, the attorneys' advice would (or should) have been that he should keep them.

Further, the revised timing of the destruction, if it occurred after the Dunlops filed their lawsuit, as Debtor initially asserted, or in the summer of 2011, still makes no sense -- unless someone is trying to eliminate relevant and potentially damaging evidence.  As noted previously, the commencement of litigation or a bankruptcy case is a reason to keep documents, not destroy them.  And if Debtor's testimony is true, he admittedly destroyed evidence relevant to a pending

---

[212] Trial Tr. vol. 11, 178:6-12 (colloquy between Court and counsel ensues regarding a potential breach or waiver of the attorney-client privilege).

litigation, which he knew was unlawful.  Next, the Dunlops did not obtain their Judgment until

August 1, 2011,[213] and Debtor did not file for bankruptcy until August 16, 2012, a year after the

Judgment and more than two years after the Dunlops commenced their State Court Litigation.  In

this Court's view, this testimony and Debtor's actions (including their timing) are far more

indicative of a party seeking to destroy or otherwise eliminate evidence that could be used against

him, rather than the innocent actions of someone intending to seek the protection of the bankruptcy

laws.

Adding to the Debtor's lack of credibility is the fact that despite his repeated claim that he

destroyed all of his computer and business records, Debtor was nonetheless able to produce a list

of ninety-three customers in support of his *in limine* motion to preclude the testimony of certain

of his other customers.[214]  That list was produced on August 30, 2016, some *five* years after the

Debtor allegedly destroyed all his computer and other business-related records.  In the Court's

view, without access to at least some business records, there is simply no likelihood that after such

a long time period, the Debtor could have come up with such an extensive and detailed list that

included not only the customer's last name but also where his or her property was located. Yet,

through approximately five years of litigation in State Court and this Court (before the submission

of that Certification), the Debtor did not produce a single document in response to multiple

document requests in either of those actions.  In short, this Court finds that the Debtor's production

of this extensive and detailed list --- approximately five years after all his documents were

purportedly destroyed -- is still another example of the Debtor's deceptiveness and further

demonstrates his lack of credibility.

---

[213] Ex. P-49.
[214] See Debtor's Cert. in Support of Motion *In Limine* for Order Prohibiting Testimony of Non-Party Customers at
¶¶ 5-6; Ex. A (Dkt. No. 90).

Finally, Debtor's actions were inconsistent with some kind of benign intent.  Instead, he testified that "[w]e got rid of all the computers.  We wiped out the computers.   Everything was gone."[215]  His intent was to destroy all of his records, and that is what he appears to have done.

In sum, these are all areas in which the Court finds Debtor's testimony to be implausibly self-serving and not credible.[216]  This lack of credibility further supports the adverse inferences to be applied against him based upon his admitted destruction of documents and information that were undeniably relevant to the multiple litigations pending against him pre-bankruptcy[217] and his contemplated bankruptcy case.   The long delay from the start of the Dunlop's State Court Litigation to the actual bankruptcy filing (more than two years later) further undercuts the Debtor's claim that the destruction was somehow based on the decision to file for bankruptcy protection.  Instead, the Court finds the purpose of destruction was to remove or conceal evidence that may be adverse to Debtor.  The Court further determines that another of the adverse inferences to be drawn from Debtor's actions and lack of credibility is to discount his testimony generally and to find against him on disputed factual issues that are based on conflicting testimony, unless sufficiently corroborated by other evidence.

## IV.    CONCLUSIONS OF LAW

### A.  The General Standards

Count One of Plaintiffs' Amended Complaint alleges that the debt of Debtor to Plaintiffs is nondischargeable because it was "obtained by false pretenses, a false representation, or actual fraud within the meaning of . . . § 523(a)(2)(A)."  Specifically, 11 U.S.C. § 523(a)(2)(A) provides that a discharge under Title 11:

> does not discharge an individual debtor from any debt --
>
> . . .

---

[215] Ex. P-56, Kim Dep., (vol. 2), May 13, 2014, Tr. 44:2-4; also at Kim Certif., Ex. A (Dkt. No. 92).

[216] In the face of all this, Debtor also had the temerity to accuse Robin of withholding discovery when he himself had not produced a single document in over five years of litigation.  Instead, he destroyed the documents.

[217] See Ex. P-51, Petition,  SoFA, ¶ 4a.

>(2) for money, property, services, or an extension, renewal, or refinancing
>of credit, to the extent obtained by --
>
>>(A)    false pretenses, false representation or actual fraud, other than a
>>statement respecting the debtor's or an insider's financial
>>condition;[218]

The burden is on the plaintiff to prove by a preponderance of the evidence that a debt is nondischargeable. *See Grogan v. Garner*, 498 U.S. 279, 288 (1991); *In re Hilley*, 124 Fed. Appx. 81, 82 (3d Cir. 2005). "The overriding purpose of the Bankruptcy Code is to relieve debtors from the weight of oppressive indebtedness and provide them with a fresh start. Exceptions to discharge are strictly construed against creditors and liberally construed in favor of debtors." *Ins. Co. of N. Am. v. Cohn (In re Cohn),* 54 F.3d 1108, 1113 (3d Cir. 1995). In a complementary manner, the purpose behind section 523(a)(2)(A) is "to prevent a debtor from retaining the benefits of property obtained by fraudulent means and to ensure that the relief intended for honest debtors does not go to dishonest debtors." *In re Sabban*, 600 F.3d 1219, 1222 (9th Cir. 2010) (internal citations omitted).

Although section 523(a)(2)(A) does not define the terms "false pretenses," "false representation" or "actual fraud," these are "common-law terms" that "imply elements that the common law has defined them to include." *Field v. Mans,* 516 U.S. 59, 69 (1995); *see also In re Purington,* 2012 WL 1945510 at *8 (Bankr. D.N.J. May 20, 2012) (in applying section 523(a)(2)(A), "courts have routinely inferred that a plaintiff must establish intent, reliance and materiality").

As to a false pretense, the courts have held that:

>A false pretense is usually, but not always, the product of multiple
>events, acts or representations undertaken by a debtor which
>purposely create a contrived and misleading understanding of a

---

[218] 11 U.S.C. § 523(a)(2)(A).

transaction that, in turn wrongfully induces the creditor to extend credit to the debtor.  A "false pretense" is established or fostered willfully, knowingly and by design; it is not the result of inadvertence.

*In re Polaschek*, 2012 WL 1569611 at *5 (Bankr. C.D. Ill. May 3, 2012) (internal citations omitted).  *See also In re Purington*, 2012 WL 1945510 at *9; *In re Reath*, 368 B.R. 415, 422 (Bankr. D.N.J. 2006) (comparing false representation with false pretenses and noting that while a false representation is express, a false pretense "involves an implied misrepresentation or conduct intended to create and foster a false impression").

A false representation is somewhat different; i.e., a "false or misleading statement about something, usually with the intent to deceive." *Holden v. Altieri (In re Altieri),* 2012 WL 3595298 at *2 (Bankr. D.N.J. Aug. 20, 2012) (quoting *In re Dobrayel*, 287 B.R. 3, 12 (Bankr. S.D.N.Y. 2002)).   "The elements comprising false representation are: (1)  the debtor made a representation; (2) the debtor knew the representation was false at the time it was made; (3) the debtor intended to deceive the creditor at the time the debtor received the money; (4) the creditor relied on the representation; and (5) the creditor sustained a loss as a result of that reliance." *In re Showalter,* 86 B.R. 877, 880 (Bankr. W.D. Va. 1988).  A plaintiff, however, "must demonstrate that the representation was one of existing fact and not merely an *opinion,* expectation or declaration of intention."[219]   Moreover, a promise to perform in the future is insufficient to establish this first element of the aforesaid test.[220]

Similar to and essentially combining the elements of false pretenses and false representation, an actual fraud "consists of any deceit, artifice, trick or design involving direct and active operation of the mind, used to circumvent and cheat another -- something said, done or

---

[219] *Id.* (emphasis added), (citing *In re Criswell*, 52 B.R. 184, 197 (Bankr. E.D. Va. 1985).  *See also Field v. Mans*, 516 U.S. at 68-69).

[220] *In re Allison*, 960 F.2d 481, 484 (5th Cir. 1992).

omitted with the design of perpetuating what is known to be a cheat or deception." *In re Purington*, 2012 WL 1945510 at *9 (quoting *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1293 (5th Cir. 1995)); (further quoting what is now 4 COLLIER ON BANKRUPTCY ¶ 523.08[1][e] at 523-46 to - 47 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.)).   "The classic five elements of fraud in this context would be: (1) a representation made by debtor to creditor; (2) debtor's knowledge of the falsity when it was made; (3) debtor's intent to deceive in making such representation; (4) creditor's justifiable reliance upon it, *see Field v. Mans*, 516 U.S. 59, 116 S. Ct. 437, 133 L.Ed. 2d 351 (1995) (holding that Section 523(a)(2)(A) requires justifiable, but not reasonable, reliance); and (5) debtor's suffering of damage as a result." *In re Dobrayel*, 287 B.R. at 12, n.3.

"Although the terms 'false pretenses,' 'false representation,' and 'actual fraud' refer to different concepts, they are closely related and each requires a plaintiff to demonstrate 'proof of false or deceptive conduct, fraudulent intent, and justifiable reliance.'" *In re Altieri*, 2012 WL 3595298 at *2 (citing *In re Neale*, 440 B.R. 510, 521 (Bankr. W.D. Wis. 2010)).   Thus, in determining whether the requirements of section 523(a)(2)(A) are satisfied, courts typically require proof that the debtor:

(a)    obtained money, property or services;

(b)    after falsely representing [or omitting] a material present or past fact;

(c)    that the debtor knew at the time was false (or was made with disregard for its truth);

(d)    the debtor intended that the plaintiff rely on that statement;

(e)    the plaintiff actually relied on that statement and the reliance was justified; and

(f)    the plaintiff sustained damages as the proximate result of the false representation.[221]

---

[221] *In re Altieri*, 2012 WL 3595298 at *2-3 (citing *In re Purington*, 2012 WL 1945510 at *9, bracketed language added).  *See also In re Reath*, 368 B.R. at 422, quoting *In re Allison*, 960 F.2d at 483 (false representation or false pretense involves: "(1) knowing and fraudulent falsehoods, (2) describing past or current facts, (3) that were relied upon by the other party"); *In re Stein*, 2011 WL 1299985 at *6 (Bankr. D.N.J. April 4, 2011) ("words, both written and oral; conduct; and even omissions may all be found to constitute a material misrepresentation. . . .").

In *Purington,* Judge Wizmur noted that in cases such as this one, involving a contractor/debtor, there are typically (though not exclusively) two ways to establish misrepresentation or fraud under section 523(a)(2)(A): "(1) to show that the contractor executed the contract never intending to comply with its terms; or (2) to demonstrate that the contractor intentionally misrepresented a material fact or qualification when soliciting the work."[222]   The *Purington* court observed:   "A contractor's general representations regarding expected work performance and the actual quality of that workmanship" generally are not sufficient to constitute misrepresentations under section 523(a)(2)(A).[223]   In other words, the plaintiff must show more than a breach of contract or shoddy workmanship in a contractor case.[224]

In this case, the focus of the alleged fraud is in two general areas.  First, the Plaintiffs allege that Debtor misrepresented his capabilities and the work he had done or could do in inducing the Plaintiffs to enter into the Contract, as well as the crews he had available to do the work.  Second, in performing the Contract, the Plaintiffs allege that Debtor misrepresented the status of various approvals needed and/or allegedly obtained to induce the Plaintiffs to make progress payments that would not have been required.  The Court has described these asserted misrepresentations in its Findings of Fact described above and will now apply those facts to the applicable law.

### B.  The Debtor's Material Misrepresentations, False Pretenses and Actual Fraud

In this case, the Debtor's statements and actions, whether analyzed under false representations, false pretenses or actual fraud, all combined to intentionally mislead the Dunlops as to: (1) Debtor's capabilities generally and the work Debtor and his "crews" had done or could do; and (2) whether Debtor had obtained the necessary approvals to move forward with the next phase of the Project.

---

[222] *In re Purington*, 2012 WL 1945510 at *10 quoting *In re Wiszniewski*, 2010 WL 3488960 at *5 (Bankr. N.D. Ill. Aug. 31, 2010).
[223] *Id.* at *10.
[224] *Id.* at *10; *see also In re Henderson*, 423 B.R. 598, 622 (Bankr. N.D.N.Y. 2010).

More specifically, the Plaintiffs allege that the Debtor, by indicating that he had done or could do the work described in the photographs that he showed the Dunlops, misled the Dunlops as to his experience and the nature and scope of construction work Debtor and his company had the ability to perform.  The Court finds that the Debtor's lack of ability is amply demonstrated by the shoddy, tardy, incomplete and otherwise substandard work Debtor did on the Project, as measured by the Contract and his actual abysmal performance.

Virtually nothing was completed on time or up to applicable standards.  The Project was consistently understaffed -- irrespective of whether Debtor's "crew" were employees or independent contractors -- and the contractors who were sporadically at the site were either unqualified or insufficiently experienced to perform the work required.  Worse still, the Dunlops paid for work that was never performed and materials that were never purchased or properly secured or stored.[225]  That understaffing and lack of qualifications and/or experience led to the delays and substandard workmanship that marked the Project throughout Debtor's tenure.

Additionally, Debtor represented that he had substantial experience in major renovations and some in new construction, which Plaintiffs believed was important because the substantial renovations they were undertaking were akin to new construction.  As to these issues, the Court will apply the adverse inference created by Debtor's intentional destruction of his documents and records and his general credibility issues to find that the photographs he presented to the Dunlops represented in certain instances: (i) work he said he had done, but had not; and (ii) work he said he had the capability and experience to do, but could not.

Even without the adverse inference, the Court finds that, based on Robin's testimony, which this Court chooses generally to believe when in conflict with the Debtor's testimony (unless independently and sufficiently supported by other evidence), certain of the photographs shown to

---

[225] See e.g., nn. 4, 5 of Pls.' Initial Trial Br. (Dkt. No. 144).

the Dunlops by Debtor represented work he said he did but did not, or work that he could do, but could not.   For example, as noted earlier, in one of the final meetings between the parties in early 2010, the Debtor admitted to the Dunlops that he did not do the work in at least some of the photographs he initially showed them when he was soliciting their business.[226]  More particularly, the final misrepresentation that led to Debtor's termination was when on or about February 15, 2010, more than a year and a half into the Project, Robin inquired as to the work in one particular photograph that the Debtor had shown her at a prior meeting and was showing her at yet another, much later meeting.  At that point, Debtor responded that he "actually didn't do that" work.[227]

In these regards, each of the parties argues that certain cases with similar factual patterns are controlling and mandate a decision in their favor.  This Court finds that those cases are helpful but not determinative, as all turn on their specific facts.  For example, the Debtor relies heavily on *In re Purington* where the court found the debtor/contractor's debt to be dischargeable because the plaintiff failed to prove an intent to deceive.  However, the *Purington* court also found that the debtor made material misrepresentations about her company's qualifications and experience:

> Here, we have more than poor quality workmanship. In her advertisement, and in her initial presentations to the plaintiff, the debtor presented herself as an experienced, qualified and competent building contractor. While there may not have been specific discussion about the registration and insurance status of the debtor's company, or about the identity or experience of the workforce associated with the company, there is no doubt that the debtor painted a picture of her company as an established enterprise that was qualified to accomplish the work being solicited.[228]

Under these circumstances, the *Purington* court had no trouble finding that the debtor misrepresented the qualifications and experience of herself and her company.[229]  This Debtor made

---

[226] Trial Tr. vol. 2, 111:1-112:4.
[227] Trial Tr. vol. 1, 50:23-51:6; Trial Tr. vol. 2, 111:1-113:2.
[228] *In re Purington,* 2012 WL 1945510 at *10.
[229] *Id.* at *11.  The *Purington* court similarly had no problem finding that the misrepresentations were made with knowledge of their falsity.

45

similar misrepresentations here as to his qualifications, experience and capabilities.  The *Purington* case then turned to the "intent to deceive factor," which the court found was not proven in the particular circumstances of that case.

Similarly, in a case cited by both parties, *In re Gonzalez*, the court found that the debtor/contractor had made material misrepresentations under section 523(a)(2)(A) when he, *inter alia*, showed the plaintiffs three properties he had allegedly completed from "the ground up," knowing that the representation was false when he made it.[230]   In this case, the Debtor's representations as to the work he had done or could do, his ability to complete this Project and his experience in essentially taking on major renovations and new construction were knowingly false as to his capabilities, experience and expertise at the time he made them.  Also false were the Debtor's representations as to the crews or workforce he had available to work on the Project, and who would work on the Project at all times and particularly when it fell far behind schedule.

Debtor also misrepresented the status of various approvals needed to move on to the next phase of construction and to be entitled to payments under the Contract.  In particular, the Court finds that Debtor misrepresented that he had obtained a demolition permit from the Borough when he had not.   Specifically, on or about August 1, 2008, Debtor represented he "had the okay to start with the demolition of the house," and Plaintiffs made the ostensibly required $50,000 payment on that date. Debtor essentially acknowledges his misrepresentation as to this approval by his argument that it was common practice to begin demolition while awaiting for issuance of the permit, and also asserts that he confirmed to the Dunlops that he would do so in advance and that they were in agreement.[231]   Robin disputes this assertion directly and testified that after Plaintiffs made the $50,000 payment and then visited the Property, they saw a lack of progress and contacted

---

[230] *In re Gonzalez*, 2014 WL 3725937 at *3 (Bankr. D.N.J. July 28, 2014).
[231] Trial Tr. vol. 10, 49:24-50:17.

the Debtor. At that point, the Debtor admitted he had not obtained the necessary permit.[232] In fact, the permit was not obtained until October 21, 2008 -- more than six weeks after the payment. Robin further testified that had she known the permit was not obtained, she would not have made that payment. The Court credits Robin's testimony and discredits the Debtor's testimony in these regards and finds that the Debtor misrepresented the status of this approval.

The next inspection/milestone was with respect to footing. The Dunlops made a $70,000 payment on November 10, 2008 based on the Debtor's representation that the footing had passed, when it had actually failed that inspection on November 7, 2008.[233] A single pass as to the footing did not occur until December 1, 2008 -- approximately three weeks later.[234] Thus, even if only a single pass was required, this was also a misrepresentation. Further, whether the Contract required a single pass or final approval, it is undisputed that additional footing inspections and approvals were required to move the Project forward, which did not occur on the Debtor's watch. Instead, after obtaining that first footing approval, the Debtor never performed any work on any of the other footings required for the Project to move forward, never scheduled any further footing inspections and never obtained any further footing approvals.[235] Thus, even though the Debtor at least implicitly -- and according to Robin, often expressly -- represented that he had the necessary approvals to move the Project forward in accordance with applicable law, he did not. Robin further testified that she would not have made this payment if she knew the requisite approval had not been obtained.[236] Like many other aspects of this Project, the footings were not finally approved

---

[232] Trial Tr. vol. 1, 132:7-133:24.
[233] Ex. P-14; Ex. D-27 at 3 of 7.
[234] *Id.*
[235] Trial Tr. vol. 1, 165:8-166:11.
[236] Trial Tr. vol. 1, 160:20-162:2; Trial Tr. vol. 10, 52:21-56:6. Here, Debtor testified that he told Robin that the footing had failed at a November 10, 2008 meeting and that Robin made the $70,000 payment anyway. Even without any adverse inference (and certainly with one), the Court resolves this factual dispute in Robin's favor as it would be completely inconsistent with Robin's attention to detail and generally conservative nature to make a payment of that substantial amount in the face of a failed inspection.

Case 12-02140-VFP   Doc 150   Filed 01/31/18   Entered 01/31/18 16:43:52   Desc Main
Document     Page 48 of 68

until much later, in this case on October 8, 2010, some eight months after the Plaintiffs terminated the Debtor and took over the Project and two years after they made the $70,000 payment.[237]

The next payments (five and six) were due on completion of the slab inspection (five) and the start of framing and plumbing (six). The slab payment was made on the date of the initial slab approval and there does not appear to be any dispute that the next payment (six) for the start of plumbing and framing was made when those tasks began. What Plaintiffs do dispute as to these items is whether the Project could move forward in accordance with applicable law without other additional approvals and whether a single inspection approval or complete approval was required.

Here, the Court is required to interpret the terms of the Contract (including specifically the SOW) that set forth the schedule by which payments were made and the Schedule's use of the singular (e.g., approval of footing inspection, which is the language in the Schedule), as opposed to the plural (e.g., approval of footing inspections or all footing inspections). In the context of this case and the other provisions of the Contract, the Court finds that the use of the singular in the Schedule is ambiguous and that it therefore must look to other evidence as to the meaning of the term.[238]

In this case, while the singular "approval of footing (or slab) inspection" is used in Schedule K, reasonable minds can differ as to whether that means only an initial or a complete approval is required. To those familiar with construction and its approval process, the use of the singular *may* be clear. But to those not well-versed in the process, the meaning is less clear. A reasonable person could conclude that for the footing inspection to pass on a construction project, all the necessary footings had to pass rather than only a portion or, even less so, just the first one. Additionally, when the terms of the entire Contract are considered, including the requirement that

---

[237] Trial Tr. vol. 1, 162:11-163:8; 164:4-7; 166:4-11.
[238] *Conway v. 287 Corp. Ctr. Assocs.*, 187 N.J. 259, 269-70 (2006) (issue as to whether a contract is ambiguous is a question of law for the court to decide in the first instance; if the court determines a contract is ambiguous, parol or extrinsic evidence may be considered).

"[a]ll work to be done to state and local codes and approved by owners," and that, by law, complete approval is required before construction on the next phase can legally begin, the more reasonable interpretation in the view of this Court is that a complete approval was required, rather than an initial or partial one.

Thus, as to the footing and slab approvals, the Court finds that the single, and admittedly incomplete initial pass obtained by Debtor was not sufficient to move the Project forward as a matter of construction law or to require an additional progress payment under the Contract.

In the context of the other material misrepresentations made by Debtor as to other passes and his capabilities, the Court is convinced that the Dunlops were induced to enter into the Contract and make progress payments (like this one) not only on the basis of the false representations made by Debtor, but also by the false pretenses of the Debtor.  Here, as noted in *Polaschek*, the false pretenses are "multiple events, acts or representations undertaken by a debtor which purposely create a contrived and misleading understanding of a transaction that, in turn, wrongfully induces the creditor to extend [payment] to the debtor."  "A false pretense . . . is not the result of inadvertence."  *In re Polaschek*, 2012 WL 1569611 at *8 (internal citations omitted).  *See also In re Beamenderfer*, 2008 WL 5158386 at *1 (Bankr. M.D. Pa. 2010) (failure to obtain appropriate inspections and approvals, along with false application for building permit, formed the basis of a section 523(a)(6) violation).  In this case, through his representations and actions, the Debtor intentionally created a "contrived and misleading understanding" of the approvals obtained and needed on this Project to move forward, as well as the work he had done or could do generally.  The same is true as to the sixth payment, which was due upon the start of framing.  Although the framing did appear to commence about the time of the sixth payment, the undisputed testimony at trial was that the Debtor was not authorized to proceed with framing at this time because other necessary approvals had not been obtained.

As noted above, the framing inspection requirement for the seventh payment was modified by the Amendment to the Contract.  The parties essentially agree that this Amendment was necessitated by a framing error made by Debtor that created an additional but unexpected "loft" area on the second floor.  Debtor advised Plaintiffs that he had obtained an initial framing approval from the Borough, excluding only the new loft area, and that final approval would be obtained shortly.  Significantly, although Debtor argues that the change order was a *quid pro quo* for additional work the Debtor agreed to perform as to the loft area, he does not dispute that he told Robin he had obtained the "initial" approval.   As a result, the Dunlops paid the $63,200 in accordance with a January 20, 2009 e-mail modifying the payment schedule.[239] However, the Dunlops subsequently learned that the Borough does not grant initial or conditional approvals, but rather performs one complete framing inspection that either passes or fails and the framing had not passed at the time.[240]  In fact, the Dunlops did not obtain final framing approvals until January 5, 2011, almost a year after Debtor was terminated.  Here again, Robin testified that this payment would not have been made if she knew the Debtor's representation as to the "initial" approval was false and misleading.[241]

The Dunlops made the eighth payment on July 11, 2009 in accordance with the modified payment schedule, believing that the framing inspection had passed and that the Debtor was authorized to begin to install sheetrock.[242]  The Debtor argues that, per the Contract as modified, all that was required was completion of the roofing and framing, not approval.  However, as noted above, Debtor does not dispute that he made the representation as to the approval.  In this Court's view, this sequence of events demonstrates that, notwithstanding the use of the singular versus the plural in the Contract, or the technical arguments now made by both sides concerning the

---

[239] Ex. P-22.
[240] Trial Tr. vol. 7, 91:4-92:3; Trial Tr. vol. 9, 26:18-27:18.
[241] Trial Tr. vol. 7, 91:4-92:3.
[242] Trial Tr. vol. 2, 74:5-75:14.

Contract's meaning and interpretation, the repeated representations by the Debtor that the necessary approvals had been obtained indicate that *he* understood the Contract and the law to mean he needed the approvals to move forward. Thus, when the Plaintiffs asked, Debtor said he had the necessary approvals so that he could obtain payment, even though he knew he did not.

As to materiality, there is no question in this Court's mind that the Dunlops relied on the photographs, Debtor's representations as to his qualifications and capabilities, the status of necessary approvals and the work force that he had at his disposal to complete the Project. As Robin repeatedly testified, she would not have entered into the Contract or made the substantial payments she made to the Debtor without those representations that also form the basis of Plaintiffs' claim for false pretenses and actual fraud.

In sum, the Debtor's misrepresentations and actions constitute materially false representations and created false pretenses that satisfy the initial requirements for proving false representations, false pretenses and actual fraud under section 523(a)(2)(A), as interpreted under the common law cited above.

Here, the Court notes that Debtor also challenges the Plaintiffs' fraud claims generally on the asserted basis that the Plaintiffs did not allege that Debtor committed any fraud until the filing of the case. However, the Plaintiffs' State Court Complaint did allege various misrepresentations that constituted violations of the New Jersey Consumer Fraud Act, including that the work of competitors was wrongly represented to be performed by the Debtor and his company, and that the Debtor commenced work prior to obtaining the required permits.[243] Those claims form the fundamental basis of this nondischargeability action. Further, there is no requirement that a fraud claim be asserted in prior proceedings before a nondischargeability complaint based on fraud is filed, and the Debtor has not pointed to any contrary case or statutory law. As is demonstrated by

---

[243] See, e.g., P-40, State Court Complaint.

this case, fraud is difficult to prove and there may be many legal and other reasons why it may not be pleaded or stated specifically before a bankruptcy case is filed, particularly where, as here, the New Jersey Consumer Fraud Act allows for a potential treble damages recovery without the need to prove scienter.  Thus, this argument is rejected by the Court.  The Court finds that the Debtor's representations as to his capabilities, experience, the status of the necessary approvals and the work force available to him were all false and material representations, made under false pretenses and also constitute actual fraud.

## C.  Scienter - Intent to Deceive

The Debtor argues that, while he made mistakes on the Project in destroying his records, and in failing to defend the State Court Litigation, he had no intent to deceive or harm Plaintiffs. More specifically, Debtor argues that there is no proof that the Debtor took on the Project never intending to finish it and that the delays were caused at least in substantial part by the delay in submitting plans to the Borough, the Plaintiffs' inability to make decisions and making multiple changes to the Project.  The Plaintiffs, of course, dispute these arguments and point to various types of circumstantial evidence to show Debtor's intent to deceive.

Here once again, there is little or no dispute between the parties as to the law, only the application of the law to the facts.  Courts must usually consider circumstantial evidence regarding the debtor's intent "[b]ecause a debtor rarely, if ever, admits to acting with the intent to deceive."[244] Once the creditor "introduces circumstantial evidence proving the debtor's intent to deceive, the debtor cannot overcome [that] inference with an unsupported assertion of honest intent."[245]

In this case, there is circumstantial and direct evidence of Debtor's intent to deceive.

---

[244] *In re Catherman*, 331 B.R. 333, 337 (Bankr. N.D. Ohio 2005) (cited by Debtor), as quoted in *In re Barnaby*, 2007 WL 750332 at *7 (Bankr. D.N.J. March 6, 2007) (cited by both parties); *In re Cohn*, 54 F.3d 1108, 1119 (3d Cir. 1995) (cited by Plaintiffs).

[245] *In re Reynolds*, 193 B.R. 195, 200 (D.N.J. 1996) (bracketed language in original) quoting *In re Van Horne*, 823 F.2d 1285, 1287 (8th Cir. 1987).

However, there is also evidence that supports the Debtor's argument that he always intended to complete the Project, but was not able to do so because of his own "mistakes" as well as the Dunlops' demands and change orders.

In weighing this evidence, the Court finds that the Dunlops proved an intent to deceive by at least a preponderance of the evidence.  The direct evidence includes the Debtor's representations as to his capabilities and experience, as well as the "crew(s)" he had at his disposal, much of which was shown to be false.  It also includes the representations as to the status of various approvals that had not in fact been obtained.  The circumstantial evidence includes numerous cash withdrawals made by Debtor ($400,000[+]) and transfers to cash and the Debtor's wife ($69,500) at or around the same time the Dunlops made payments to the Debtor.[246]  Those transfers belie Debtor's claim that he needed the payments from the Plaintiffs to pay for work on the Project. Instead, this evidence indicates that he needed (and used) the money for personal expenses and/or other non-Project related purposes.

Further, the Plaintiffs' proofs at trial (which formed the basis of the State Court Judgment) showed that the Plaintiffs paid the Debtor $577,438.88 for his services, incurred additional expenses of $243,357.57 to correct Debtor's deficient work, $125,671.11 to replace damaged materials and furnishings that Debtor failed to keep safe and $419,650.62 to complete the Project, for a total of $1,366,118.10 (which was trebled by the State Court for violations of the New Jersey Consumer Fraud Act).  Of the $577,438.88 paid to the Debtor for his services, Robin estimated that at least $300,000 was for services that Debtor never performed.[247]  In this Court's view, this circumstantial evidence further demonstrates that this Debtor knew he was deceiving the Plaintiffs when he requested and received payments based on approvals that had not been obtained, work

---

[246] Trial Tr. vol. 3, 150:4-7; 155:24-156:1, 156:24-157:2;  Ex. P-60.
[247] Trial Tr. vol. 3, 53:2-5.

that was never or not completely performed and crews he was going to bring to the site that never materialized.

Thus, while this Court cannot say for certain that the Debtor never intended to complete the Project when he started,[248] it can and does determine, by a preponderance of the evidence, that the representations Debtor made to get the work, including the photographs and misstatements as to his capabilities, and then to obtain at least certain of the progress payments from the Plaintiffs were made with the intent to deceive. Indeed, although Debtor projects a polished and earnest demeanor, his changing testimony and positions, as well as his actions, speak otherwise.

In these regards, the Court is also persuaded by the litany of "misstatements" made by Debtor and his improper actions prior to and during the prosecution of this case, all of which detract from the Debtor's credibility and demonstrate a pattern of deception, false pretenses and an intent to deceive, including:

(1) Destruction of all his business records and information, including his website while various cases against him were pending and he was contemplating a bankruptcy filing due in substantial part to his business failures, including particularly, this Project;

(2) Misrepresentations as to whether Nicholas was an employee;[249]

(3) His changing testimony as to when he destroyed his records, from as early as 2009 (when he was still very much in business and could not practically have done so) to 2010 to the Summer of 2011, long after he had been sued by the Dunlops (and others);

(4) His ability to somehow remember the names and locations of ninety-three of his customers in 2016, five (or more) years after he had allegedly destroyed all his records;

(5) His original defense or justification for the destruction of the records by essentially stating that his attorneys gave him that advice, and then retreating from that position when he was being cross-examined at trial and it appeared

---

[248] As was noted above, this circumstance is only an example of when a contractor's debt may be deemed nondischargeable under 11 U.S.C. § 523(a)(2). In other words, it is not an exclusive or complete testing of such circumstances, which include the more general frauds found here.

[249] This misrepresentation was acknowledged by the Debtor only on cross-examination after he was presented with evidence from the website he destroyed.

that one or more of the attorneys who allegedly gave him that advice may be called as witnesses;

(6) His acknowledgement (again on cross-examination) that the destruction of documents is "illegal";

(7) His failure to tell the Plaintiffs or the Court in the State Court Litigation that he destroyed all his documents;

(8) His failure to produce *any* documents in this case or the State Court Litigation; and

(9) His initial position that all Robin's changes to the Contract documents were accepted without question or comment, as compared to his acknowledgement at trial that many of the changes represented the result of their joint discussions and negotiations.

In sum, the Court finds an intent to deceive the Dunlops in inducing them to enter into the Contract and then obtaining payments from them. That intent is demonstrated by the direct and circumstantial evidence referenced above, and is further demonstrated by the improper actions and misstatements during the State Court Litigation and in this case. In reaching this determination, the Court is guided by the cases ably cited by both sides in support of their respective positions.[250] However, the decision in this case is based on the particular facts and circumstances proven at trial and the application of those facts to the general principles of law cited above. In summary, this Court finds that the Debtor would often say what he thought he needed to say to first induce the Dunlops to enter into the Contract and then to obtain payments from them, without regard -- or at least with a reckless disregard -- for the truth.

---

[250] *E.g.*, *Purington* and *Barnaby* (by the Debtor) and *In re Ferguson*, 222 B.R. 576 (Bankr. N.D. Ill. 1998) and *In re Carle*, 2010 WL 5394793 (Bankr. W.D. Tex. Dec. 28, 2010) (by the Plaintiffs).

### D. **Justifiable Reliance**

It is now well established that section 523(a)(2)(A) requires justifiable, rather than reasonable, reliance on a representation.[251] The Supreme Court further explained this distinction as follows:

> Although the plaintiff's reliance on the misrepresentation must be justifiable . . . this does not mean that his conduct must conform to the standard of the reasonable man. Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases. [Restatement (Second) of Torts], § 545A, Comment *b*. Justifiability is not without some limits, however. As a comment to § 541 explains, a person is
>
>> required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation.[252]

That said, a person is justified in relying on a representation even though he or she may have been able to determine its failure through an investigation.[253]

In this case, Robin is an experienced attorney, specializing in drafting and negotiating commercial (as opposed to real estate or construction) contracts. In her trial testimony and in the communications she produced in discovery, Robin demonstrated an attention to detail and thoroughness that would appear to serve her well in her practice as a corporate attorney. While born in Korea, the Debtor was well educated in the United States (Rutgers University and University of Pennsylvania) and abroad. The Court declines the invitation to give either party the upper hand in the contract negotiations. Any "advantage" Robin may have gained by her training and experience as an attorney was offset by the Debtor's experience and knowledge of the construction business, as well as the Ivy League education he so effectively marketed. Further, in

---

[251] *Field v. Mans*, 516 U.S. 59, 74 (1995).
[252] *Id.* at 70-71.
[253] *Id.* at 70.

another of the Debtor's shifting arguments, the Debtor initially asserted that all the changes to the Contract documents were made by Robin and accepted without comment or question by the Debtor. At trial, however, the testimony revealed that, while Robin was certainly the scrivener, many of the changes to the Contract documents were discussed, negotiated and agreed upon by Robin and the Debtor prior to being incorporated by Robin into the Contract.

Further to this point, the Court finds that if the Debtor were less concerned about the specific language of the Contract documents, it was because: (i) he was in control of the actual construction process and had superior knowledge and experience as to that process, including particularly the approvals needed to move the Project forward; and (ii) he was anxious to get the Project and the payments started so he could satisfy his cash flow needs.[254] Thus, to the extent the Debtor is arguing that Robin's reliance could not be justified because she had superior drafting and negotiating skills as an attorney, that argument is rejected.[255] Instead, the Court finds the parties' bargaining positions to be essentially equal for the reasons stated.

The Debtor also argues that the Plaintiffs' reliance on the photographs could not be justifiable because of the integration clause that Robin included in the Contract. However, the Plaintiffs' argument is that they were fraudulently induced to enter into the Contract by the Debtor's misrepresentations as to his capabilities and more specifically, the work he had done or could do, as represented by the photographs. It is hornbook law that an integration clause does not bar a fraud in the inducement claim.[256] That is because with such a claim, the aggrieved party is not seeking to enforce the contract but avoid or rescind it by asserting it would never have been entered into in the first place if the misrepresentations were not made.[257]

---

[254] See discussion, *infra,* regarding cash withdrawals/transfers from the Debtor's account.
[255] *Cf.* Debtor's Initial Br. at 30.
[256] *Ocean Cape Hotel Corp. v. Masefield Corp.*, 63 N.J. Super. 369, 378 (App. Div. 1960) ("It is well settled that a party to an agreement cannot, simply by means of a provision in the written instrument, create an absolute defense or prevent the introduction of parol evidence in an action based on fraud in the inducement to contract.")
[257] *Ocean Cape*, 63 N.J. Super. at 378 (App. Div. 1960) ("[P]arol proof of fraud in the inducement is not considered

The integration clause similarly does not bar Plaintiffs' fraud claims as to the approvals, inspections and payments. By its terms, the integration clause applies to "*prior* negotiations, representations or agreements, either written or oral."[258] The false statements as to the approvals, inspections and payments were all necessarily made after the Contract was entered into. Thus, the integration clause does not apply to these representations either.

Debtor also argues that the Plaintiffs' reliance on his representations was not justifiable because Booker, a longtime family friend, whom the Plaintiffs hired as a "project manager" *after* the Contract was entered into, did not think the Debtor was capable of handling the Project.[259] Unfortunately for the Plaintiffs, Booker was only able to express his concerns after the Dunlops had already reached agreement with the Debtor, based on his representations as to his qualifications as described above.[260]

After a long and arduous search process that ended with Debtor's selection and execution of the Contract, the Plaintiffs chose to continue with the Debtor notwithstanding Booker's subsequent concerns, as they were entitled to do. It is here that the difference between reasonable and justifiable reliance becomes significant. Under a reasonable, more objective standard, it would have been a somewhat closer call as to whether the Plaintiffs' reliance on Debtor's representations was reasonable (though the Court would still find for Plaintiffs under the "reasonable" standard). However, under the more nuanced and subjective "justifiable" standard, the circumstances of this particular case, rather than the community as a whole, must be considered.[261] And in this case, the

---

as either additional or substitutionary but rather as indicating that the instrument is, by reason of the fraud, void or voidable. The evidence is admitted, not in order to enforce the contract, but rather to avoid it, or as here, to prosecute a separate action predicated upon the fraud") (internal citations omitted); *Betz Labs., Inc. v. Hines*, 647 F.2d 402, 408 (3d Cir. 1981) (holding that "evidence of fraud in the inducement is outside the parol evidence rule and, consequently, admissible").

[258] Ex. P-6 at 17 and 31 (AIA *Standard Form of Agreement Between Owner and Contractor* Document A101-2007, Art. 1; AIA *General Conditions* Document A201-2007, § 1.1.2).

[259] Trial Tr. vol. 2, 11:22-12:24; Trial Tr. vol. 4, 51:10-12.

[260] Trial Tr. vol. 4, 41:20-22.

[261] *See Field v. Mans,* 516 U.S. at 70-71.

Plaintiffs interviewed numerous parties before picking the Debtor, only after meeting with him over a period of months and determining he was the best man for the job before Booker was retained.  Having come all that way, it was not unreasonable, or more to the point, unjustifiable for the Dunlops to continue with the Debtor even after Booker expressed his concerns.  After all, the Contract with Debtor had already been entered into, and terminating the Debtor post-Contract would have subjected them to a potential lawsuit for breach of contract and required them to start their search all over again.  That would be more than this Court believes is required to satisfy the justifiable reliance standard of section 523(a)(2)(A).

As to the Plaintiffs' reliance on Debtor's representations as to the status of approvals and inspections, the Court has no difficulty finding the Plaintiffs' reliance to be justifiable (and reasonable).  The Debtor was the expert, the one they hired to complete the Project and obtain the necessary approvals.  It was certainly understandable for Plaintiffs to rely on Debtor, whom they initially held in such high regard, when he told them an approval had been obtained and that therefore payment was due.  What would be unreasonable would be to charge Plaintiffs with having to investigate independently the status of the approvals after Debtor said he had obtained them.

Accordingly, the Court finds the Plaintiffs justifiably relied on Debtor's representations as to his capabilities and as to the status of required approvals and inspections.

### E.  <u>Knowledge of Falsity</u>

As is demonstrated by the facts referred to above and the discussion relating to scienter, the Debtor undoubtedly knew his representations as to his and his company's capabilities and experience and as to the status of various approvals were false when he made them.  The inspection reports obtained by the Dunlops after the Debtor's termination showed that many of the approvals

had not been obtained when the Debtor said they were or that initial approvals had been obtained,

even though no initial approvals were given by the Borough, as was demonstrated at trial.

Similarly, when the Debtor showed the Dunlops photographs of the work that he allegedly

had done or could do in order to solicit their business, he intentionally overstated his qualifications

in two material ways.  First, he told them that he had done at least certain work that he had not.

Additionally, he told them he could do work that he was not able to do.  As to the work he

represented he had done, but did not, he plainly knew his representations were false, and belatedly

acknowledged as much to the Dunlops in at least once instance, but only after -- more than a year

after -- he had obtained their business and *after* he had failed miserably on the Project, was

substantially behind schedule and had been notified of his breach by the Dunlops.  As to the work

he could do, the Debtor either knowingly made those misrepresentations or did so with a "reckless

disregard for the truth" and as part of the Debtor's zealous efforts to: (i) get the Dunlops' business;

and then (ii) obtain payments from them.

Finally, the Debtor also knowingly misrepresented the scope and qualifications of the

"crew" that was available to work on the Project, particularly when he fell so far behind schedule

and stated he would bring in multiple crews to finish the Project.  In short, the Debtor did not have

access to the number of workers he needed with the skills and qualifications required to complete

or even move on to the next stage of the Project.  Here again, the Court finds that the Debtor made

these misrepresentations with knowledge of their falsity or at least a reckless disregard for the

truth, as he knew what workers were available to him and what capabilities they had (or did not

have).

### F.  Damages and the Application of Collateral Estoppel

The final requirement of section 523(a)(2)(A) for an exception to discharge is that the

"creditor sustained the alleged loss and damage as the proximate result of the representations"

made by the Debtor.[262]   In this case, there is no question that the Plaintiffs were damaged by Debtor's actions and representations.  In fact, as was noted above, after a proof hearing, the State Court entered a Final Judgment in the amount of $4,098,354.54 consisting of the following components:

| | |
|---|---|
| Amount Paid to Debtor | $ 577,438.88 |
| To correct deficient work | 243,357.57 |
| To complete Project | 419,650.62 |
| Replacing Damaged Materials | 125,671.11 |
| SUBTOTAL: | $1,366,118.18 |
| Trebling pursuant to NJCFA | x 3 |
| TOTAL: | $4,098,354.54 |

The Dunlops argue that under *In re Cohen,* 191 B.R. 599, 609 (D.N.J. 1996), *aff'd* 106 F.3d 52 (3d Cir. 1997), *aff'd* 523 U.S. 213 (1998), the treble damages allowed by the New Jersey Consumer Fraud Act are not dischargeable and that collateral estoppel applies to prevent the Debtor from relitigating the issue of damages as the result of the Final Judgment in the State Court, citing *In re Docteroff*, 133 F.3d 210, 215 (3d Cir. 1997).

On the other hand, the Debtor argues that any reliance on the *Cohen* decision is misplaced because that case was "premised on the determination by the Bankruptcy Court that the debtor had committed an 'unconscionable commercial practice under the New Jersey Consumer Fraud Act,'" and no such determination had been made here.  However, that determination has now been made as this Court has found that the Debtor made false representations and pretenses which not only violate the New Jersey Consumer Fraud Act, but also satisfy the requirements of 11 U.S.C. § 523(a)(2)(A) for an exception to discharge.  Thus, *Cohen* is applicable, as is the treble damages aspect of the New Jersey Consumer Fraud Act, which "was codified and therefore entirely foreseeable by the debtor at the time he made the false representation to the plaintiffs."[263]   The

---

[262] *See, e.g., In re Reath*, 368 B.R. at 422.
[263] *In re Cohen*, 191 B.R. at 609, *aff'd* 106 F.3d at 55-59, *aff'd* 523 U.S. at 223.

same result would apply even if the treble damages were considered punitive.[264]  Thus, all the damages are subject to trebling under the New Jersey Consumer Fraud Act and are nondischargeable under *Cohen*.

As to the application of *res judicata* and collateral estoppel, the Debtor argues that the State Court Default Judgment is not entitled to *res judicata* effect because the claims raised in the Dunlops' State Court Complaint did not reach the level of false representations, false pretenses or actual fraud required for a section 523(a)(2)(A) action.[265]  This Court agrees as to the issue of liability because no specific intent to defraud was proven or required to be proven in the State Court Action, and it does not appear that the Dunlops argue otherwise.[266]  Instead, the Dunlops argue that the sister doctrine of collateral estoppel or issue preclusion applies only to the *amount* of damages awarded by the State Court.[267]

As to collateral estoppel, the Debtor argues that it does not apply because the issue of damages was not "actually litigated" as the Debtor did not participate in the proof hearing (although he did participate in various pretrial proceedings) and because he allegedly did not have notice of that hearing, citing *In re Azeglio*, 422 B.R. 490, 497 (Bankr. D.N.J. 2010).[268]  In this connection, the Debtor urges the Court not to follow the Third Circuit's opinion in *In re Docteroff*, 133 F. 3d at 215, which held that the "actually litigated" standard could be satisfied where the

---

[264] *In re Cohen*, 106 F.3d at 55-59.

[265] *See, e.g., In re Cobley,* 89 B.R. 446, 447-48 (Bankr. E.D. Pa. 1988).

[266] In entering Final Judgment, the State Court did, however, comment that it thought the Debtor's wrongful actions may rise to the level of criminal activity, as was noted above. Ex. P-48, State Court Hr'g Tr. 32:2-9, July 27, 2011.

[267] See Pls.' Post-trial Br. at 43-44 (Dkt. No. 144).

[268] Debtor does not dispute, nor could he dispute, that the other requirements for collateral estoppel apply.  *See Mullarkey v. Tamboer (In re Mullarkey)*, 536 F.3d 215, 225 (3d Cir. 2008) ("Both New Jersey and federal law apply *res judicata* or claim preclusion when three circumstances are present: '(1) a final judgment on the merits in a prior suit involving (2) the same parties or their privies and (3) a subsequent suit based on the same cause of action'"); *Winters v. N. Hudson Reg'l Fire & Rescue*, 212 N.J. 67, 85 (2012) (the party asserting collateral estoppel or issue preclusion "must show that: (1) the issue to be precluded is identical to the issue decided in the prior proceeding; (2) the issue was actually litigated in the prior proceeding; (3) the court in the prior proceeding issued a final judgment on the merits; (4) the determination of the issue was essential to the prior judgment; and (5) the party against whom the doctrine is asserted was a party to or in privity with a party to the earlier proceeding"); see also, *In re Docteroff*, 133 F.3d at 214. The lack of a mutuality requirement under federal collateral estoppel does not make a legally significant difference here because the State Court Action involves the same parties as in the present matter.

debtor's bad faith conduct prevented the issue from being further litigated.  The Debtor argues that *Docteroff* does not apply because it is factually distinguishable from this case and *Docteroff* applied federal claim preclusion law rather than state law.  This Court finds that those limited distinctions do not make a substantive difference and that *Docteroff* sets forth the controlling standards here.  These arguments will be addressed in turn.

First, 28 U.S.C. § 1738 directs a federal court to refer to the preclusion law of the state in which the judgment was entered, i.e., New Jersey.[269]  Next, federal and New Jersey state common law regarding the principles and application of collateral estoppel (or issue preclusion) are substantively similar if not identical.  Both New Jersey courts and our federal courts look to the RESTATEMENT (SECOND) OF JUDGMENTS § 27 for the elements of issue preclusion.[270]  Thus, the Court finds that there is no substantive difference between federal and state issue preclusion law, and that the Debtor does not point to any such difference.

The Debtor also suggests that *Docteroff* represents "an exceptional rule, not to be applied rigidly in all instances of procedural default," citing a case from the District Court for the Middle District of Pennsylvania, *In re Parker*, 250 B.R. 512, 518 (M.D. Pa. 2000).  However, *Parker* was decided on a summary judgment motion (and left the issue of application of collateral estoppel for determination at trial).  Further, in this Court's view, *Parker* involved less egregious disregard of the discovery process than exists in this case, which the Court finds more akin to *Docteroff*, as will be described in more detail below.  Moreover, this Court believes it is bound by the Third Circuit's precedential ruling in *Docteroff,* rather than a lower court decision from outside this District that distinguishes and seems to decline to follow or at least limit the *Docteroff* ruling.

In *Parker*, only twelve days passed from the debtor's failure to comply with an order

---

[269] *Marrese v. Am. Academy of Orthopaedic Surgeons*, 470 U.S. 373, 380 (1985).
[270] *See, e.g., In re Docteroff*, 133 F.3d at 214-16; *Azeglio*, 422 B.R. at 494-95, nn. 3, 4, 5.  Both cases note that New Jersey State Courts and the District Court follow the RESTATEMENT (SECOND) OF JUDGMENTS).  *Accord Hernandez v. Region Nine Hous. Corp.,* 146 N.J. 645, 659 (1996) (as to New Jersey State Courts).

compelling discovery and the entry of default, the debtor allegedly informed a partner of plaintiff's law firm of his change of address (but he was not served there) and the debtor was unrepresented by counsel at the time of his default.  In this case, the Complaint in the State Court Action was filed in March of 2010, default was not entered until March 14, 2011,[271] a year later, and default judgment was not entered until August 1, 2011, four and a half months after entry of the default.[272] Thus, this Debtor had more than sufficient time to respond.  Further, Plaintiffs attempted to serve and re-serve Debtor at the addresses then available for him and also served Debtor's counsel.[273] The Debtor ultimately filed for bankruptcy protection only after the Dunlops began collection efforts against him, which the Debtor obviously knew about.

Also in contrast to *Parker,* the Debtor here was represented by counsel in the State Court Action, at least through discovery and there is no evidence that his counsel had withdrawn at the time of default or even default judgment.  Most significantly in this Court's view, the debtor in *Parker* did not destroy all his documents while or after the prior litigation was ongoing.  Thus, there are material differences between this case and *Parker,* both as to substance and procedural posture.

As was noted above, Debtor also relies on *In re Azeglio*, 422 B.R. at 497 in arguing that collateral estoppel should not apply in this case.  In *Azeglio*, the Court held, in predicting how the New Jersey Supreme Court would decide that a default judgment in a New Jersey Consumer Fraud Act action involving a contractor entered after the defendant/debtor participated in pretrial proceedings, but did not have notice of or appear at trial, would not be given collateral estoppel effect because the issue was not actually litigated.[274]

---

[271]  Ex. P-47 at Ex. F.
[272]  Ex. P-49.
[273]  Ex. P-47 at ¶ 27 and Ex. G.
[274]  Accordingly, the *Azeglio* court denied summary judgment, allowing the matter to proceed to trial.  *Azeglio,* 422 B.R. at 497.

This Court finds *Azeglio* distinguishable on the facts because: (i) the record in this case does not disclose that Debtor's State Court counsel withdrew from his representation prior to trial, as was the case in *Azeglio*; (ii) notice of the hearing to enter final judgment was given to Debtor's counsel and to Debtor at more than one address, and this Court simply does not believe Debtor's self-serving testimony that he did not know about the hearing; and (iii) most significantly, there is no indication that the debtor in *Azeglio* destroyed all the documents relevant to his case.  As to the legal issues, the *Azeglio* court cited *Docteroff* with approval, noting that *Docteroff* represents an exception to the general rule that collateral estoppel does not apply to a default judgment under the federal common law where the default arose from sanctionable conduct by the defendant that prevented the matter from actually being litigated.[275]

In this case, the Court finds the Third Circuit's decision in *Docteroff* controlling, particularly because the Debtor's conduct prevented that matter from being litigated in that: (i) Debtor knowingly and voluntarily declined to further participate in the State Court Litigation after participating in various pretrial proceedings, including filing a counterclaim and serving discovery; and (ii) Debtor destroyed all of his documents and other business information in 2011, after the State Court Action was commenced.  For these reasons, the Court does not believe *Azeglio* is controlling in this case and predicts that the Supreme Court of New Jersey, if given the opportunity, would follow *Docteroff* in these exceptional (and different) circumstances.

As to the asserted factual differences between this case and *Docteroff*, the Debtor argues that the bad faith present in *Docteroff* does not exist here.  This Court disagrees.  First, Debtor argues that he simply chose not to defend himself, primarily for financial reasons, and was allegedly not sent notice of the proof hearing, whereas the debtor in *Docteroff* participated

---

[275] *Id.* at 494 n.5.

extensively in the state court litigation and "simply elected not to comply with court orders."[276]

But what happened in *Docteroff* is very similar to what happened here. After first participating in

the case and filing not only an answer and counterclaim, but also serving and obtaining his own

discovery from the Dunlops, the Debtor twice failed to comply with court orders requiring him to

provide answers to interrogatories and document requests.[277] As a result, the Debtor's answer was

first stricken without prejudice and then, upon the second failure, with prejudice, as is provided by

N.J.R. 4:23-5(a)(1) and (2). Like the debtor in *Docteroff*, the Debtor's answer was stricken and

default judgment entered against him as a sanction only *after* his failure to comply with multiple

court orders.

Although the Debtor argues that he stopped litigating in State Court for financial reasons,

this Court finds that, while the continuing cost of litigation may have been a factor in the Debtor's

decision, it was also based on his contemplated bankruptcy filing and his destruction of his records

after the State Court Litigation began. In other words, he stopped litigating because he had already

destroyed all the documents and information being requested of him and he thought he would

never have to pay the Dunlops anything. Thus, he did not comply with those orders because of

his own intentional actions that were for his perceived benefit. In this regard, the Court notes that

there is no testimony or other evidence that the Debtor told the court in the State Court Litigation

or the Dunlops that he was not producing any documents because he had destroyed them. He

obviously would not do that because it would be the admitted spoliation of evidence (or worse).

---

[276] Debtor's Post-Trial Br. at 52 (Dkt. No. 143). In *Docteroff,* default judgment was entered as to liability and the court scheduled a trial on the issue of damages. Docteroff filed for bankruptcy protection on the day the damages trial was scheduled to begin. 133 F.3d at 214. In finding that Docteroff was collaterally estopped from litigating issues as to liability, the court relied upon the RESTATEMENT (SECOND) OF JUDGMENTS and the applicable law from other circuits and determined that each of the elements of collateral estoppel, including the requirements that the issue be actively litigated and the judgment be final, were satisfied -- even though damages had not been determined. *Id.* at 214-16. Here, final judgment as to liability and damages was entered, so finality is not an issue.

[277] Ex. P-47.

Instead, Debtor destroyed the evidence, did not tell anyone and then let the default be entered against him.

Accordingly, this Court finds that the circumstances here are in at least one material way substantially different and *worse* than in *Docteroff*:  Debtor here *admits* destroying all his computer records and business-related documents *after* being sued by the Dunlops.  This is the definition of bad faith.  Applying the standards established by the Third Circuit in *Docteroff*, this Court does not hesitate to find that a party who: (i) deliberately fails to comply with discovery requests and orders; and (ii) then destroys all the documents and information relevant to the State Court Action and his contemplated bankruptcy case is acting in bad faith.  In these circumstances, the Debtor is deemed to have actually litigated an issue -- here damages -- for purposes of collateral estoppel application.[278]

Like the debtor in *Docteroff*, this Debtor does not deserve "a second bite at the apple" on the issue of damages after deliberately failing to comply with his discovery obligations, especially when the Court considers the additional aggravating factor of the Debtor having intentionally destroyed all the documents and information that were sought in the state and bankruptcy court proceedings.  This Court agrees with *Docteroff's* reasoning that permitting a debtor "to relitigate the issue in light of his original [and intentional] rejection of a full and fair opportunity to litigate would implicitly endorse his abuse of the judicial process."[279]  In this case, allowing the Debtor to relitigate the damages issue would effectively reward the Debtor's failure to produce documents and participate at trial, as well as his intentional destruction of evidence.  This further abuse of the

---

[278] This aspect of the Court's holding as to collateral estoppel is limited to the issue of damages.  The Court is making an express and independent finding of fraud and false pretenses as to the issue of the dischargeability of Plaintiffs' claim.

[279] *In re Docteroff,* 133 F.3d at 215 (bracketed language added); *see also In re Cohen,* 191 B.R. at 609, *aff'd* 106 F.3d at 55-59, *aff'd* 523 U.S. at 222-23 (damages awarded under New Jersey Consumer Fraud Act, including treble damages, were nondischargeable, even if the treble damages were deemed to be punitive in nature).

system will not be permitted by this Court.    Accordingly, the State Court Judgment will be given

collateral estoppel effect as to the amount of damages.

## V.     **CONCLUSION**

For all the foregoing reasons, the Plaintiffs' State Court Judgment against the Debtor is

determined to be nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).  Accordingly, judgment

will be entered in favor of Plaintiffs and against the Debtor declaring that the State Court Judgment

in the amount of $4,135,330.05, plus accruing interest at the State Court Judgment rate, is

nondischargeable.


Dated: January 31, 2018                              /s/ Vincent F. Papalia
                                                     VINCENT F. PAPALIA
                                                     United States Bankruptcy Judge